# Drennen *v.* Merchantile Trust & Deposit Co.

*Petition in Pending Suit in Equity for Establishment of Priority of Employès Claim over Lien of Bondholders of a Corporation.*

1. *Claims of employés of a corporation have priority over lien of mortgage securing bonds.*—Where, after the execution of a deed of trust by a mining, manufacturing or other private corporation to secure bonds issued by it, and a short time before the appointment of a receiver at the instance of the trustee in said deed of trust in a suit seeking its foreclosure, the employés of such corporation do work and perform services about the business of the corporation which contribute to the permanent improvement or betterment of the corporate property, or which was necessary to keep the corporation a "going concern," the deed of trust and bonds evidencing a contemplation of the parties to them that the operations of the corporation should be kept on foot and going, and a necessity therefor as the means of producing a net income out of which it was understood the bonds, principal and interest, were to be paid, for such work and services, the employés have a claim or lien on the property of the corporation which has preference and priority of payment over the bondholders, the gross earning of the corporation before the receivership having been

[Drennen v. Mercantile Trust & Deposit Co.]

diverted from the payment of the wages and accounts of the employés and paid to the bondholders; and for the establishment and enforcement of such claim or lien they can intervene by petition in the pending foreclosure suit. (*Merchants Bank of Atlanta v. Moore*, 106 Ala. 646, in so far as in conflict with the principle here announced, overruled.)  COLEMAN and HEAD, JJ., *dissenting*.

2. *Same; to what extent the lien of employé can be enforced.*—The claim or lien of such employés has priority and is enforceable to the extent that their work or services contributed to the permanent improvement or betterment of the corporate property, or in so far as the gross earnings of the corporation have been diverted from the payment of their wages and paid to the bondholders.

3. *Same; right of assignee of employés claims.*—The assignees of the claims of employés of a corporation are invested with the same right to assert the priority of the assigned claims over a lien of the mortgage upon the corporation's property as the employés themselves had.

4. *Chancery pleading and practice; sufficiency of averment in petition.* In a petition seeking to intervene in a pending chancery suit, the averment of a material fact on the information and belief of the petitioner is sufficient.

5. *Same; same; notice.*—A petition of intervention in a pending chancery suit, praying that notice of its filing be given to the parties in the pending suit, is sufficient in respect of making parties to the intervention.

APPEAL from the City Court of Birmingham, in Equity.
Heard before the Hon. H. A. SHARPE.

The facts of the case are sufficiently stated in the opinion.

WALKER, PORTER & WALKER, for appellants.—1.   It is now well settled that employés of a railroad company, for work done within six months before the appointment of a receiver of such company, have claims or liens on the corpus and income of such company prior and superior to the lien of the bondholders under a trust deed executed by such company upon all its property before the work was done.   In support of this proposition see *Union Trust Co. v. Ill. Mid. R. R. Co.*, 117 U. S. 434; *Miltenberger v. Logansport Railway Co.*, 106 U. S. 286; *Fosdick v. Schall*, 99 U. S. 235; *Farmers L. & T. Co. v. K. C., W. & N. W. R. Co.*, 53 Fed. Rep. 128; *Litzenberg v. Jarvis, &c., Co.*, 28 Pac. Rep. 871;

38

*Poland v. Lamoille Val. R. R. Co.*, 52 Vt. 144; *Burnham v. Bowen*, 4 Sup. Ct. Rep. 675; Gluck & Becker on Receivers of Corporations, pp. 94-97.

2. All the real reasons given in the decisions in railroad cases apply with equal force to the case at bar. If a railroad employè has a lien, why not an employé of the Mary Lee Coal & Railway Co.? The record shows that this company owned a coal mine which it worked and from which it took great quantities of coal; that it owned a large number of coke ovens in which it manufactured large quantities of coke; that it had the right of eminent domain; that it owned and operated a railroad about six or seven miles in length, over which it carried its coal and coke to market and freight for others and passengers for hire; that it owned a steamship which it run in the Gulf of Mexico; that it employed a large number of employés and operatives; that it had valuable contracts with railroad companies which it would lose if it could not dig up the coal from said mine; that it owed a large amount of wages to its employès and operatives. The record further shows that these debts were such as aided in conserving the property of the Mary Lee Coal & Railway Company; these employés kept all the property going, repaired the coal mine, coke ovens and railroad, and, by digging coal and making coke, enabled the Mary Lee Coal & Railway Company to hold its valuable contracts. The work done by these employés is of the same kind that all the decisions say aid in conserving the property of the railroad companies.—*Farmers L. & T. Co. v. K. C., W. & N. W. R. Co.*, 53 Fed. Rep. 182; *Fosdick v. Schall*, 99 U. S. 235; *Litzenberg v. Jarvis, &c., Co.*, 28 Pac. Rep. 871; *Poland v. Lamoille Valley R. Co.*, 52 Vt. 144; *Burnham v. Bowen*, 4 Sup. Ct. Rep. 677.

3. The trustees of the bondholders, under the trust deeds in this case could have taken possession of the property or foreclosed the trust deeds of the Mary Lee C. & R. Company, because the provisions of the trust deeds in regard to the sinking fund were not complied with by the Mary Lee Coal & Railway Company. The record shows that these provisions were never, from the date of the trust deeds, complied with. The trust deeds gave the trustee power to take possession or foreclose. The trustee or bondholders could have filed a bill to

foreclose the trust deeds and for a receiver immediately after default in the payment of interest in July and September, notwithstanding the provisions in the trust deeds to the effect that such default shall continue for three months.—Jones on Corporate Bonds and Mortgages, §§ 384, 385; *Central Trust Co.* v. *T. & St. L. R. Co.*, 23 Fed. Rep. 846; *Mercantile Trust Co.* v. *M., K. & T. R. Co.*, 36 Fed. Rep. 221.

JOHN P. TILLMAN, *contra.*—1. The employès of private corporations, for work recently done before the appointment of a receiver, do not have a lien upon property or income of the corporation, which is superior to the lien of the holders of the bonds secured by a deed of trust executed by the company prior to the doing of the work by such employès. The doctrine has heretofore been applied only in cases involving mortgages executed by railroad corporations, or by other like *quasi* public corporations. In these cases the conclusion reached has been made to rest, in part at least, upon the character of the corporation executing the mortgage; and, in its further development, the courts have declared that it should be limited, rather than extended; and it has been frequently held not to apply to private corporations. Turning to the history of this confessedly new doctrine, it was, we believe, first judicially announced by Judge Drummond in *Turner* v. *Ind., B. & W. R. Co.*, 8 Biss. 315; 24 Fed. Cas. 366, though a practice founded upon the doctrine had previously for sometime been followed. In the case cited, we have the first enunciation of this new policy, which has since become crystalized into a doctrine. It has confessedly no precedent in adjudged cases to support it; and the express and only reasons stated in its defense are (1) the peculiar character of railroads, and mortgages conveying them, and (2) the declared power of a chancery court, in the appointment of a receiver, to prescribe, as a condition therefor, the payment of certain character of claims. What brings into exercise this supposed power of the court? Manifestly the peculiar character of the properties which the jurisdiction of the court is invoked to administer, and not any recognized equity in employés to any part of the income. It was expediency, not right, that gave birth to the practice—then a policy, now a principle. Prior

to the decision in *Fosdick v. Schall,* 99 U. S. 235, the circuit courts, in their administration of receiverships of railroad properties, were not in accord upon this doctrine, and this fact, no doubt, induced the Chief Justice, in delivering the opinion, to discuss and declare the doctrine, although it was not necessary to the decision of the case before him; for it is manifest that what he there says upon the subject was *dictum.* The decision, however, has been followed in subsequent cases, raising directly the question; and the doctrine, in its limited application, is not now an open question in the Federal courts. It is manifest, however, from the reasoning adopted in that case, as well as in subsequent cases, that the character of the property the court was administering entered into and formed an essential part of the argument upon which the decision was made to rest. It will be observed, in the first place, not only was the case one involving railroad property, but that the court treats that fact as a peculiar fact, involving in itself the principle under consideration, and differentiating it from property owned by other corporations or persons. The court does not proceed upon a general proposition applicable to all mortgages, or to mortgages executed by all corporations, and then apply it to railroad mortgages, as coming within the general proposition; but, on the contrary, it is the idea of the court, deducible both from the argument used, and the guarded language employed, that the status of railroad property requires the court to adopt a doctrine, exceptional in its character, and applicable only to that character of property. Not only in that case, but in the cases following it, and in text books, like phraseology is used.—*Miltenberger v. Logansport R. Co.,* 106 U. S. 286.

2. In *Burnham v. Bowen,* 111 U. S. 776, *Fosdick v. Schall* was cited and approved by the court; Chief Justice WAITE, in delivering the opinion of the court, adding: "The business of a railroad should be treated by a court of equity under such circumstances as a 'going concern,' not to be embarrassed by any unnecessary interference with the relations of those who are engaged in, or affected by it.—*Un. Trust Co. v. Ill. Mid. R. R. Co.,* 117 U. S. 454. The decision in *Wood v. Guarantee Trust & Dep. Co.,* 128 U. S. 416, is important as indicating that the Federal Supreme Court will not extend the doctrine

[Drennen v. Mercantile Trust & Deporit Co.]

as to private corporations. It is declared by the court that "The doctrine of *Fosdick v. Schall* has never yet been applied in any case except that of a railroad. The case lays great emphasis on the consideration that a railroad is a peculiar property, of a public nature, and discharging a great public work. There is a broad distinction between such a case and that of a purely private concern." The decision in the case of *Kneeland v. Amer. Loan Co.*, 136 U. S. 97, declares the. policy of the Supreme Court of the United States to limit, and not to extend the doctrine. In *Morgan's Co. v. Texas Central R. Co.*, 137 U. S. 171, the doctrine is again brought before the court, and Chief Justice FULLER, after commenting upon the decision in *Fosdick v. Schall*, refuses to extend it. In *Thomas v. Western Car Co.*, 149 U. S. 95, the doctrine came again before the Federal Supreme Court, Justice SHIRAS delivering the opinion. He quotes approvingly what was said in *Miltenberger v. Logansport Railway Co.*, 106 U. S. 286, and in *Kneeland v. American Loan Co.*, 136 U. S. 97, and a claim for rent of cars was refused priority. See also the following cases : *Farmers L. & T. Co. v. Northern Pac. R. Co.*, 74 Fed. Rep. 433 ; *Williamson v. Wash. City, &c., R. R. Co.*, 1 Amer. & Eng. R. R. Cas. 498 ; *Addison v. Lewis*, 75 Va. 701, 9 Amer. & Eng. R. R. Cas. 702 ; *Southern R. Co. v. Carnegie Steel Co.*, 76 Fed. Rep. 492 ; *Farmers' L. & T. Co. v. K. C., &c., R. Co.*, 53 Fed. Rep. 182 ; *R. R. Co. v. Cowdrey*, 11 Wall. 459 ; *Cen. T. Co. v. Thurman*, 94 Ga. 735 ; *Raht v. Attrill*, 106 N. Y. 423; *Coe v. N. J. Mid. Railway Co.*, 31 N. J. Eq. 132 ; *Hunt v. Memphis Gas Light Co.*, 31 So. West Rep. 1006 ; *Farmers' & Merchants' Nat. Bank v. Waco R. & L. Co.*, 36 N. W. Rep. 131 ; *Farmers' Loan Co. v. D. & M. Tel. Co.*, 148 N. Y. 315.

3. The leading case of *Meyer v. Johnston*, decided by this court, 53 Ala. pp. 335–50, upon the power of a court of chancery to issue receivers' certificates, a kindred subject, shows the conservatism of the court in upholding the contract rights and liens of parties, and is well worthy of careful consideration. The careful opinion in that case, we respectfully submit, is at war with the doctrine here contended for. True, preferential debts were then unknown, and their consideration was not then before the court ; but the power of the court of chancery upon the

[Drennen v. Mercantile Trust & Deposit Co.]

kindred subject of receivers' certificates was then, for the first time, presented to the court for its consideration, and it had to proceed to that consideration with the aid of but little light from adjudicated cases; for that doctrine was then comparatively new in our jurisprudence, and its extent and boundaries but dimly portrayed. Much that is said in that case is applicable to the question under consideration.

4. Turning to the text books, we find that they recognize the doctrine as limited to the properties of railroads, and of other corporations impressed with like public duties.—5 Thompson, Commentaries on Law of Corporations, §§ 7046, 7053, 7055, 7114, 7115, 7118; Baech on Receivers, §§ 387, 402; High on Receivers, (3d ed.), § 394a; Cook on Stocks & Stockholders, § 861; Wait on Insolvent Corporations, § 280; Jones on Corporate Bonds, § 555.

5. In *Hooper v. Cen. Trust Co.*, 32 Atl. Rep. 505, decided on 20th June, 1895, the Court of Appeals of Maryland decided that certificates issued by a receiver to pay unsecured claims against a private corporation cannot be given priority over an antecedent mortgage; and the argument then used clearly sustains our contention. In *Seventh Nat. Bank v. Shenandoah Iron Co.*, 35 Fed. Rep. 436, this question was presented and the opinion of the court is against the applicability of the doctrine to private corporations. In *Fidelity Ins., &c., Co. v. Shenandoah Iron Co.*, 42 Fed. Rep. 372, the application of this doctrine to manufacturing corporations was denied. In *Bound v. South Carolina R. Co.*, 50 Fed. Rep. 312, this doctrine was held not to apply to steamship lines. In *Farmers' Loan & Trust Co. v. Grape Creek Coal Co.*, 50 Fed. Rep. 481, GRESHAM, Circuit Judge, had before him the question whether the court has the power, against the objection of a small minority of bondholders, to authorize a receiver to issue certificates which shall be a first lien on the mortgaged property, in order to enable him to continue the operation of the mines of a mining corporation; a question similar to the one under consideration. The court refused to authorize the issuance of receivers' certificates which should be a first lien on the mortgaged property.

In *Hanna v. State Trust Co.*, 70 Fed. Rep. 2, decided by the circuit court of appeals for the eighth circuit, on

23d September, 1895, the question came before the court in respect to the issue of receiver's certificates in a case involving the property of private corporations ; and the authority to issue such certificates was denied.   In *Scott v. Farmers' Loan & Trust Co.*, 69 Fed. Rep. 17, and in *Glenn v. Liggett*, 47 Fed. Rep. 472, it is said : "Ordinarily, and in the absence of a statute expressly authorizing such a proceeding, courts of equity have no greater control over the affairs of a private corporation, when it becomes an insolvent, than they have over the affairs of an individual."

In *Laughlin v. United States Rolling Stock Co.*, 64 Fed. Rep. 25, the power of the court to issue receivers' certificates to pay off unsecured claims against a private corporation, was again denied.   In *Newton v. Eagle & Phoenix Manufacturing Co.*, 76 Fed. Rep. 418, it was held that in the case of an insolvent private corporation, the court will not order receiver's certificates to be issued for the purpose of raising money to pay interest on bonds of the company, thereby displacing existing liens.

5.   In *Fidelity Insurance, &c., Co. v. Roanoke Iron Co.*, 68 Fed. Rep. 623, we find an elaborate discussion of this question.   It was held in this case that a court of equity has no power, without the consent of all lien-holders, to authorize the receiver of an insolvent private corporation, whose business is not affected with any public interest, to issue certificates which will be a paramount lien upon its property, for the purpose of carrying on its business.   In *Snively v. Loomis Coal Co.*, 69 Fed. Rep. 204, the application of this doctrine to a mining and manufacturing corporation was denied.   In *Merchants' Bank v. Moore*, 106 Ala. 646, this court, in harmony with the general principles decided in the leading cases in which the doctrine is applied to railroad cases, and with all cases, so far as we have been able to find—and our research has been long and painstaking—in which the doctrine has been attempted to be extended to private corporations, decided against the appellants' contention. After a discussion of the principles upon which the doctrine was first established, it is said in that case : "No court that we are aware of has ever held that the rule applied in such a case as the present, and we are quite sure that a proper regard for the sanctity of con-

tracts, and just observance of the distinguishing line between the judicial and legislative departments, will not permit the rule to be extended by courts to any other than the 'specified and limited cases.' "

It has been said, however, that this court recognized the doctrine as applicable to private corporations in the case of the *Tallassee Manufacturing Co.*, 64 Ala. 567. A consideration of the issues involved, and the decision rendered in that case, or those cases (for there were three separate appeals), will clearly show that the opinion rendered therein was not and cannot be considered as a recognition by this court of the doctrine of *Fosdick v. Schall,* in its application to a case like the one at bar.

An examination of the foregoing authorities, we feel confident, will demonstrate that the courts, whether wisely or unwisely, whether logically or illogically, have heretofore recognized and established the doctrine of *Fosdick v. Schall* in railroad cases, because of the public nature and character of that class of corporations, owing to the public the duty of continued and unbroken operation ; that, for the same reason, recognizing a "broad distinction" between such corporations and those of a private nature, the court have refused to extend the doctrine to the latter class of corporations ; and that, whether they esteemed the public nature of railroad corporations as one of the reasons of premises for the conclusion reached, or merely as an "excuse" or "justification" for the application of the doctrine, they have refused, because of that fact, to extend the doctrine. There are manifest differences between railroad corporations and those organized for manufacturing and other industrial purposes.

7. The doctrine of *Fosdick v. Schall* is a departure from what was formerly considered well settled principles, is unsound, and therefore should not be extended. *Galveston Railroad v. Cowdrey*, 11 Wall. 459 ; *Dunham v. Railway Co.*, 1 Wall, 254 ; *Hall v. M. & M. R'y Co.*, 58 Ala. 10 ; 1 Jones on Mort., 670, and authorities cited ; *Duncan v. M. & O. R. Co.*, 2 Woods, 542 (8 Fed. Cases 17) ; *Haven v. Adams*, 4 Allen (Mass.) 80 ; *Ellis v. B. H. & E. R. R. Co.,* 107 Mass. 1 ; *Williams v. Chapman*, 17 Ill. 423 ; *Metropolitan Trust Co. v. Tonawanda, &c. R. R. Co.*, 103 N. Y. 245 ; *Denniston v. C. A. & St. L. R.*

[Drennen v. Mercantile Trust & Deposit Co.]

Co., 4 Biss. 414 (7 Fed. Cases 482) ; *Bergen v. Carman*, 79 N. Y. 146 ; *Vatable v. N. Y., L. E. & W. R. R. Co.*, 96 N. Y. 49 ; *In re Regent's Canal Iron Works Co.*, 3 Ch. Div. (L. R.) , 420 ; and other authorities *supra*.

8. Again, the authorities. sustaining this doctrine in its application to railroad corporations are not in harmony in respect to the reasons upholding it, or in respect to the character of the claims to which it is applicable. Starting out as a *dictum*, with no precedents cited in support of it, confessedly a new departure from theretofore well settled principles, and justified as exceptional in character, this lack of harmony is not surprising.

Nearly every principle upon which the doctrine is made to rest in *Fosdick v. Schall*, has either been repudiated or has been criticised and qualified. That there should be a diversion of the earnings, has been held not to be a necessary part of the doctrine.—*Un. Trust Co. v. Souther*, 107 U. S. 591 ; *Farmers L. & T. Co. v. K. C. &c. R. R. Co.*, 53 Fed. Rep. 182 ; *Finance Co. v. Charleston &c. R. R. Co.*, 62 Fed. Rep. 205. That the bondholders constituted the railroad company their agent by permitting the property to remain in the possession of the company after default, is not only contrary to sound principles, but has been emphatically denied.—*Hill v. Case*, 14 Fed. Rep. 141 ; *Blair v. St. L. R. Co.* 22 Fed. Rep. 477 ; *Farmers L. & Trust Co. v. Railway Co.*, 45 Fed. Rep. 664. That the doctrine can rest upon the discretion reposed in a court of equity upon granting receiverships, is, in effect, repudiated in *Kneeland's Case*, 136 U. S. 97, and in *Thomas' Case*, 149 U. S. 95.

9. The decision in the case of *O'Bear v. Volfer*, 106 Ala. 205, which cites with approval the case of *Hollins v. Brierfield C. & I. Co.*, 150 U. S. 371, is wholly inconsistent with the idea, which to us seems to be the underlying principle upon which the doctrine asserted in the case at bar rests, and that is, that the gross. earnings of a corporation, while managed by itself, and before its property and affairs are placed in the hands of a receiver, belong, in equity, to laborers and supply men who contributed to such earnings, or that upon such earnings, or if they are diverted, upon the property of the corporation, they have a lien, charge or equity, giving them priority over pre-existing liens, created by law, or by the lawful contract of the corporation. This

proposition is wholly inconsistent with the argument and decision in the case last cited, and, in no way, can they be reconciled. A doctrine, exceptional in its character, born of peculiar conditions, confessedly a departure from established principles, and resting upon no reasoning which is supported by the consensus of judicial authority, is not a doctrine, to say the least of it, that should be extended, either in the character of claims protected by it, or in the character of corporations to which it may be applied.

McCLELLAN, J.—The Mary Lee Coal and Railway Company having made default in the payment of the interest on its bonded indebtedness, the trustee in the mortgages executed by said company to secure its said indebtedness, seasonably after such default made, filed a bill in the city court of Birmingham praying the appointment of a receiver "with full power and authority to demand, sue for, collect, receive and take into his possession the goods, chattels, rights, credits, moneys and effects, lands, tenements, books, papers and property belonging to the said Mary Lee Coal and Railway Company, and that said receiver may receive from the said court, in addition to the ordinary powers possessed by such receivers, full power and authority to manage, run and operate said property, and to carry out any and all contracts that said company may have made (and to renew the same), connected with the conduct of their business, and especially the contract with T. G. Bush, Receiver, if essential thereto to pay to the said Bush, Receiver, any indebtedness which may now be due him, and to preserve and protect the corporate franchises, privileges and property, and to preserve the corporate existence of the said company, and to preserve all corporate property from being sacrificed under any proceeding which can or may be taken and would be likely to prejudice or sacrifice the same and that an injunction may issue against the said defendant company and all persons claiming to act by, through or under it, and all other persons, to restrain them from interfering with the said receiver's taking possession of and managing the said property." The further prayer of the bill is for the ascertainment of the mortgage indebtedness, principal and interest, a decree requiring the defendant to pay

[Drennen v. Mercantile Trust & Deposit Co.]

the same by a short day to be named by the court, and, in default of such payment, for a decree that said company and all other persons claiming under it be absolutely barred and foreclosed of and from all right of equity of redemption in and to said premises, and for a decree directing the sale of the whole mortgaged premises for the payment of said bonded indebtedness and the interest thereon, &c., &c.

The premises embraced in the mortgages, and for which a receiver and sale are thus prayed, consisted of a coal mine and plant complete, coking ovens and a railway in Jefferson county. The railway was six or seven miles in length, built primarily, it may be admitted, for the development and to be used in the working of defendant's said mine, but defendant's charter, which authorized the construction and operation of this railway, required that defendant should transport persons and the property of others upon it, so that as to this road the defendant corporation was a common carrier.

A receiver was appointed in accordance with the prayer of the bill, and took possession of all the property and effects of the respondent corporation. The bill was filed and the appointment made on November 28th, 1893.

On February 20th, 1894, Drennen & Company filed a petition in the cause, which, as finally amended, presents the following averments : That the defendant, The Mary Lee Coal and Railway Company, is indebted to petitioners in the sum of $14,697.52, including interest to time of filing the petition, and that all this indebtedness had accrued during the months of August, September, October and November, 1893 ; that, as shown by the bill, said defendant owned and operated a coal mine, coke ovens and a railway in Jefferson county at the time of the appointment of the receiver under said bill, and that the defendant had carried on these operations for six months prior to such appointment, and that the company then owed a large amount of back wages to its employès and operatives, a great part of which was due to them for work and labor done in said mine and in and about said coke ovens and railway ; that the amount alleged to be due petitioners from said company is a part of such back wages due by defendant to its said employès and operatives for work and labor done and performed for the defendant during the

months of July, August, September, October and November, 1893, and the books and accounts of petitioners, showing the said amount alleged to be due them, have been compared and checked over with the books and accounts of the defendant, which are in the possession of the receivers in the cause, and both sets of books and accounts agree as to said amount due the petitioners; that the work done by said employés and operatives during said months consisted in part in digging and mining and shipping coal, in keeping said mine in operation and in preparing said coal for shipment, and that about $8,947.52 of the amount due petitioners was for this work, in other part, to the extent of about $750 in value, in operating and repairing defendant's said railroad, and for the rest, to the extent of about $5,000, in the operating and repairing said coke ovens and in preparing coke for shipment to market, and that all said work was necessary to enable the defendant to carry on its business, and was done for the benefit of the complainant in the cause and to preserve the property and franchises of the defendant embraced in the deeds of trust to the complainant; that petitioners have been informed and believe and so state, that there was due to the defendant at and before the time of the appointment of the receiver the sum of about $40,000, for coal and coke sold by the defendant, which had been taken from said mine and manufactured in said ovens, that $40,000 represented gross earning of the defendant into which the labor of said employés and operatives entered, and that they performed work and labor in mining said coal and in manufacturing said coke; that defendant was and had been for a year or more prior to the appointment of the receiver a corporation duly organized under the general laws of Alabama, and as such had power to condemn land for railroad purposes and to operate its said railroad as a common carrier, and did so operate it; and that petitioners for value purchased from said employés and operatives their claims against the defendant, aggregating said sum of $14,697.52, and said claims were duly transferred and assigned to them before the appointment of said receiver. The following is the prayer of this petition: * * * "That your Honors will take jurisdiction of this petition, and that a day be fixed or set for the hearing of the same, and that such

[Drennen v. Mercantile Trust & Deposit Co.]

notice as is required by law and the rules of your Honors' court be given or served upon the parties to this cause; and that upon the hearing of this their petition, your Honors will render a decree declaring, or establishing, the said claim of the petitioners a prior and preferred claim to and over said mortgages or deeds of trust of complainant; and that the said receivers be required to pay said claim of petitioners out of the first moneys that come into their hands over and above what shall be necessary to pay the running and operating expenses of said property. Petitioners ask and pray for all other and such other orders and decrees as may be necessary in the premises." The petition is verified, one of the petitioners making oath that its allegations and statements made of his own knowledge, he knows to be true, and those made upon information and belief, he believes to be true.

To this petition the complainant in the cause interposed a demurrer assigning numerous grounds of objection to its sufficiency. The assignments chiefly relied on may be summarized as follows: (1.) That the petition fails to show that the Mary Lee Coal and Railway Co. is a railroad corporation. (2.) That the petition fails to show that the receivers have any money in their hands subject to the payment of petitioners' claim; or that complainant or the bondholders ever received any moneys that should have been paid to the petitioners; or that they were ever paid anything on their bonds after the accrual of the claims of petitioners; or that the security afforded by said mortgages was enhanced or improved in value by the rendition of the services referred to in the petition. (3.) That the petition fails to show that the Mary Lee Coal and Railway Co. ever diverted any of its gross earnings from the payment of its running expenses either for the improvement or betterment of its said railroad or other property, or for the payment of interest on any of the bonds secured by said deeds of trust, or any of the other charges secured by either of said deeds. And there are other assignments, based on the grounds above stated, going separately to the particular claims of petitioners for work, &c., done on the railroad, on the coke ovens and in manufacturing and shipping coke, and in the mine, severally. These need not be further set out at this place.

The city court sustained complainant's demurrer, and dismissed the petition; and from that decree petitioners prosecute this appeal.

The equitable doctrine, whereby employès of railway corporations which have passed into the hands of receivers, on bills for foreclosure and the like filed by or in behalf of the holders of their bonded indebtedness secured by mortgage or deed of trust, are given a preference and priority of payment over the bondholders in respect of wages earned within a short period—generally said to be six months—before the appointment of the receiver, is thoroughly well established in other jurisdictions, and especially in the decisions of the Supreme Court of the United States.—*Fosdick v. Schall*, 99 U. S. 235; *Miltenberger v. Logansport R'y Co.*, 106 U. S. 286; *Burnham v. Bowen*, 111 U. S. 776; *Kneeland v. American Loan Co.*, 136 U. S. 39; *Trust Co. v. Ill. Mid. R. R. Co.*, 117 U. S. 434; *Farmers' Loan & Trust Co. v. K. C., W. & N. W. R'y Co.*, 53 Fed. Rep. 182; *Poland v. Lamoille Valley R. R. Co.*, 52 Vt. 144; *Litzenberger v. Jarvis, &c., Mortgage Trust Co.*, 28 Pac. Rep. 871; *Union Trust Co. v. Souther*, 107 U. S. 591; *Morgan's R. R. & S. S. Co. v. Texas Central R'y Co.*, 137 U. S. 171; *Hale v. Frost*, 99 U. S. 389.

The grounds of this doctrine, and its extent and limitations, are nowhere more lucidly and forcibly stated than in the opinion of Chief Justice WAITE in *Fosdick v. Schall, supra*, where it is, we believe, first clearly expounded and declared; and we cannot do better here than to quote the language of that learned judge: "As to the second question, we have no doubt that when a court of chancery is asked by railroad mortgagees to appoint a receiver of railroad property, pending proceedings for foreclosure, the court, in the exercise of a sound judicial discretion, may, as a condition of issuing the necessary order, impose such terms in reference to the payment from the income during the receivership of outstanding debts for labor, supplies, equipment, or permanent improvement of the mortgaged property as may, under the circumstances of the particular case, appear to be reasonable. Railroad mortgages and the rights of railroad mortgagees are comparatively new in the history of judicial proceedings. They are peculiar in their character and affect peculiar interests. The

[Drennen v. Mercantile Trust & Deposit Co.]

amounts involved are generally large, and the rights of the parties oftentimes complicated and conflicting. It rarely happens that a foreclosure is carried through to the end without some concessions by some parties from their strict legal rights, in order to secure advantages that could not otherwise be attained, and which it is supposed will operate for the general good of all who are interested. This results almost as a matter of necessity from the peculiar circumstances which surround such litigation.

" The business of all railroad companies is done to a greater or less extent on credit. This credit is longer or shorter, as the necessities of the case require ; and when companies become pecuniarily embarrassed, it frequently happens that debts for labor, supplies, equipment, and improvements, are permitted to accumulate, in order that bonded interest may be paid and a disastrous foreclosure postponed, if not altogether avoided. In this way the daily and monthly earnings, which ordinarily should go to pay the daily and monthly expenses, are kept from those to whom in equity they belong, and used to pay the mortgage debt. The income out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment, and useful improvements. Every railroad mortgagee in accepting his security impliedly agrees that the current debt made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income. If for the convenience of the moment something is taken from what may not improperly be called the current debt fund, and put into that which belongs to the mortgage creditors, it certainly is not inequitable for the court, when asked by the mortgagees to take possession of the future income and hold it for their benefit, to require as a condition of such an order that what is due from the earnings to the current debt shall be paid by the court from the future current receipts before anything derived from that source goes to the mortgagees. In this way the court will only do what, if a receiver should not be appointed, the company ought itself to do. For even though the mortgage may in terms give a lien upon the profits and income, until possession of the mortgaged

[Drennen v. Mercantile Trust & Deposit Co.]

premises is actually taken or something equivalent done, the whole earnings belong to the company and are subject to its control.—*Galveston Railroad v. Cowdrey*, 11 Wall. 459; *Gilman et al. v. Illinois & Mississippi Telegraph Co.*, 91 U. S. 603; *American Bridge Co. v. Heidelbach*, 94 U. S. 798.

"The mortgagee has his strict rights which he may enforce in the ordinary way. If he asks no favors he need grant none. But if he calls upon a court of chancery to put forth its extraordinary powers and grant him purely equitable relief, he may with propriety be required to submit to the operation of a rule which always applies in such cases, and do equity in order to get equity. The appointment of a receiver is not a matter of strict right. Such an application always calls for the exercise of judicial discretion; and the chancellor should so mould his order that while favoring one, injustice is not done to another. If this cannot be accomplished, the application should ordinarily be denied.

"We think, also, that if no such order is made when the receiver is appointed, and it appears in the progress of the cause that bonded interest has been paid, additional equipment provided, or lasting and valuable improvements made out of earnings which ought in equity to have been employed to keep down debts for labor, supplies, and the like, it is within the power of the court to use the income of the receivership to discharge obligations which, but for the diversion of funds, would have been paid in the ordinary course of business. This, not because the creditors to whom such debts are due have in law a lien upon the mortgaged property or the income, but because, in a sense, the officers of the company are trustees of the earnings for the benefit of the different classes of creditors and the stockholders; and if they give to one class of creditors that which properly belongs to another, the court may upon an adjustment of the accounts, so use the income which comes into its own hands as, if practicable, to restore the parties to their original equitable rights. While, ordinarily, this power is confined to the appropriation of the income of the receivership and the proceeds of moneyed assets that have been taken from the company, cases may arise where equity will require the use of the proceeds of the sale of the mortgaged property in the same way. Thus,

it often happens that, in the course of the administration of the cause, the court is called upon to take income which would otherwise be applied to the payment of old debts for current expenses, and use it to make permanent improvements on the fixed property, or to buy additional equipment. In this way the value of the mortgaged property is not unfrequently materially increased. It is not to be supposed that any such use of the income will be directed by the court, without giving the parties in interest an opportunity to be heard against it. Generally, as we know both from observation and experience, all such orders are made at the request of the parties or with their consent. Under such circumstances, it is easy to see that there may sometimes be a propriety in paying back to the income from the proceeds of the sale what is thus again diverted from the current debt fund in order to increase the value of the property sold. The same may sometimes be true in respect to expenditures before the receivership. No fixed and inflexible rule can be laid down for the government of the courts in all cases. Each case will necessarily have its own peculiarities, which must to a greater or less extent influence the chancellor when he comes to act. The power rests upon the fact, that in the administration of the affairs of the company the mortgage creditors have got possession of that which in equity belonged to the whole or a part of the general creditors. Whatever is done, therefore, must be with a view to a restoration by the mortgage creditors of that which they have thus inequitably obtained. It follows that if there has been in reality no diversion, there can be no restoration; and that the amount of restoration should be made to depend upon the amount of the diversion."—99 U. S. 235, 251 *et seq.*

The subject matter involved in the case of *Fosdick v. Schall*, was railroad property and stress is laid upon that fact in the opinion. Morever, in all the cases cited above as sustaining this doctrine, the question arose between mortgagees of railroad property, or receivers of railroads, and persons who claimed to have furnished labor or supplies in the operation of the loan or to have put permanent improvements and betterments upon the property; and this character of the property is not infrequently referred to in these cases as one of the grounds or reasons for the existence of the doctrine; nor is there lacking in

many·of them expressions, which are perhaps no more than *dicta* of the Judge writing the opinion, to the effect that the rule has never been and cannot be extended to the property of any other corporation or class of corpo-. rations. The application of the principle to railroad corporations and property, and the view that it should not be extended to other corporations and their property, is based partly upon the supposed peculiarities of .such corporations in the manner of conducting their business, adverted to somewhat by Chief Justice WAITE, *supra,* but mainly on their public character, the public uses to which their property is devoted, the public convenience which their business is to conserve, the right and interest which the public have in the carrying on of their business, without break, let or hindrance, and their corresponding duty to the public to so carry it on. But while these considerations are pretty generally referred to in these cases, the *equity of the principle* is nowhere nor in any degree made to rest upon them. To the contrary they seem to be advanced merely for the purpose of affording a justification—we had almost said excuse—for the application and effectuation in the particular case of an abstract equity resting entirely upon other and altogether sufficient grounds of recognized equitable cognizance, and which needs no other justification or excuse for its application in any case than the existence of the facts upon which it arises and rests. It may be—probably is—that all which is said in the cases about railroads, and this equity being confined to the property, &c. of railroad corporations, comes from a conservative view of the sacredness of the rights of mortgagees as against the subsequently accruing claims of third persons, and is prompted by an apprehension that if the principle is allowed to operate in respect of the property of other corporations, as to which there may not be, from all points of view, the same necessity for its application, it would become an engine of oppression to bondholders and be used in violence to their vested rights and interest. This view is most commendable, but the apprehension is without any reasonable foundation, it seems to us. If the principle is equitable in itself, it can never be used to work injustice or inequity to bondholders, or to anybody else. And that it is equitable in itself, and without reference to whether the mortgagor

corporation is a railroad company or not, is demonstrated by the opinion of Judge WAITE in *Fosdick v. Schall*, which has been uniformly followed and never doubted, and is demonstrable by every consideration obtaining in the premises.

The doctrine proceeds on the broad principle, which underlies the administration of all law concerning property rights, that when one party has property which belongs to another restitution in some form or another must be adjudged or decreed by the courts upon proper and seasonable application by the party aggrieved. The theory is, to get nearer the case in hand, that the bondholders, or the receiver for them, have property or something of value to which the party invoking the court's aid has a better abstract right, a superior equity. To state the proposition yet more concretely: The equity arises and is rested upon one or another of three following categories or states of fact: *First*, That the gross earnings of the corporation before the receivership, to which its operatives and laborers and persons furnishing necessary supplies are upon all the authorities entitled in preference and priority to the bondholders, have been diverted from the payment of their wages and accounts and paid to the bondholders, or are in the hands of the receiver to be paid to the bondholders, or to be expended by him in the further operation of the corporation's works for the benefit of the bondholders, or have been expended either before or after receiver appointed in the improvement and betterment of the mortgaged property, whereby the security of the bonds is increased to the obvious advantage and benefit of the bondholders. Or, *second*, That, whether strictly speaking there has been any diversion of gross earnings from the employés directly or indirectly to the bondholders or not, the operatives and laborers have performed services and labor in the improvement and betterment of the mortgaged property, so that such labor and services have inured directly to the benefit of the bondholders in the enhancement of the value of their security, and hence of their bonds, they thereby securing, in addition to the property embraced in their mortgages, the value of the services of the company's operatives and laborers, which value belongs to such operatives and laborers, and would have been paid

to them, it is to be assumed, by the corporation out of its gross earnings but for the intervention of the bondholders, and the appointment at their instance of the receiver. Or, *third*, That labor and services have been performed and rendered in carrying on the business. of the corporation and keeping it a "going concern," the mortgages and bonds evidencing a contemplation of the parties to them that the operations of the corporation should be kept on foot and going, and a necessity therefor as the means of production of the net income out of which the bonds, principal and interest, are to be paid; that the business has been kept going by the receiver and earnings from it have been realized; that such earnings have been paid to the bondholders, or are held by the receivers, and that the laborers have not been paid for services thus rendered prior to the receivership. The first two categories of fact under which such priority will be awarded, are fully stated and the equity of the results flowing from them is fully demonstrated in the opinion of Judge WAITE copied above. The third finds ample illustration and support in an opinion of the Supreme Court of the United States, delivered also by the Chief Justice, in *Burnham v. Bowen*, 111 U. S. 776, where it was sought to have the amount due Bowen for coal supplied to a railroad company before the appointment of the receiver made a first charge upon the income of the receivership, and, such income having been paid to the bondholders, to have payment made out of the *corpus* of the mortgaged property; and it is not questioned that sums due to laborers stand upon the same footing as supply accounts in this connection. In the course of the opinion Judge WAITE said: "In the present case, as we have seen, the debt of Bowen was for current expenses and payable out of current earnings. * * * It is said, however, that as no part of the income, before the appointment of the receiver, was used to pay mortgage interest, or to put permanent improvements on the property, or to increase the equipment, there was no such diversion of the funds belonging in equity to the labor and supply creditors as to make it proper to use the income of the receivership to pay them. The debt due Bowen was incurred to keep the road running, and thus preserve the security of the bond creditors. If the trustees had taken possession

[Drennen v. Mercantile Trust & Deposit Co.]

under the mortgage, they would have been subjected to similar expenses to do what the company, with their consent and approbation, was doing for them. There is nothing to show that the receiver was appointed because of any misappropriation of the earnings by the company. On the contrary, it is probable, from the fact that the large judgment for the right of way was obtained about the same time the receiver was appointed, that the change of possession was effected to avoid anticipated embarrassments from that cause. But, however that may be, there certainly is no complaint of a diversion by the company of the current earnings from the payment of the current expenses. So far as anything appears on the record, the failure of the company to pay the debt to Bowen was due alone to the fact that the expenses of running the road and preserving the security of the bondholders were greater than the receipts from the business. Under these circumstances, we think the debt was a charge in equity on the continuing income, as well as that which came into the hands of the court after the receiver was appointed as that before. When, therefore, the court took the earnings of the receivership and applied them to the payment of the fixed charges on the railroad structures, thus increasing the security of the bondholders at the expense of the labor and supply creditors, there was such a diversion of what is denominated in *Fosdick v. Schall*, the 'current debt fund,' as to make it proper to require the mortgagees to pay it back. So far as current expense creditors are concerned, the court should use the income of the receivership in the way the company would have been bound in equity and good conscience to use it if no change in the possession had been made. This rule is in strict accordance with the decision in *Fosdick v. Schall*, which we see no reason to modify in any particular."

And to the same effect, that it is not necessary to the application of this doctrine that there should be, strictly speaking, any diversion of income before the appointment of the receiver, are the opinions of Judge THOMPSON, expressed in his work on Corporations, and of Judge CALDWELL on the circuit bench. — 5 Thomp. Corp., § 7118; *Farmers' Loan & Trust Co. v. Railroad Co.*, 53 Fed. Rep. 182.

Enough has, we think, been said by ourselves and

through our adoption of the language of Judge WAITE to demonstrate that the equity of the doctrine lies solely in the facts that the gross income of the corporation which in good conscience belongs to its laborers and operatives has been, in one form or another, diverted from them and converted directly or indirectly to the use, benefit and behoof of the bondholders to whom in equity and good conscience it does not belong, whether the mortgages securing the bonds in terms embrace income or not, until the wages of laborers and operatives and the accounts of supply or material-men for labor done and supplies furnished recently before the appointment of the receiver have been paid. And this is the whole equity, and it is in itself a perfect equity. The fact that the corporation is of a public character does not enter into it and is not an element of it, any more than such fact would be necessary to a recovery in trover for a horse converted by a corporation. Every element of this equity may exist as well against a private as against a public corporation, and against bond creditors of the one as well as the other. The right to be asserted is obviously the same whatever the character in this respect of the corporation. The wrong done to the employés is the same—the misappropriation of the fund for the payment of their wages. And the remedy for the effectuation of the right and the redress of the wrong is applied upon considerations which take no account of whether the corporation whose earnings have thus been wrongfully diverted from the payment of its employés is a railroad company, or a manufacturing company, or a mining company. The diversion of the fund being shown and the equity being thus made to appear, the redress is accorded, the equity is declared and effectuated by courts of chancery upon that broad and beneficent maxim of equity jurisprudence which imposes, or authorizes the court to impose, upon every suitor asking equitable relief the duty and burden of doing equity; and we have not heard or seen it suggested that this principle is applicable more to one suitor than another or more to a public than a private corporation. The necessity for the application of this equitable doctrine, for giving preference to claims of employés for wages, is doubtless more frequent in railroad cases, but that does not argue that the facts which authorize it can not well

exist in other cases.   So there is more necessity ordinarily for a railroad corporation to be kept a "going concern," because of the duty it owes the public and the character of its business, and hence it is true that the facts stated constituting the equity of the doctrine in the third category, *supra*, exist more frequently in respect of railroad property.   But there may well be, from the point of view of the bondholders, as much necessity to keep the works of a private corporation going in order to protect and preserve the property which is the bondholders' security as also to earn income for the payment of current expenses and the principal and interest of the bonds.   And the necessity of keeping the corporation a going concern is in all cases gauged, not from the standpoint of the public, but from the standpoint of the bondholders, and for the purpose of determining, not what injury the public would have suffered from the stoppage of the works, nor how they have been benefitted by the continuation of the business, but what injury the bondholder would have suffered from such stoppage in the loss of net income and the diminution of the value of the property, with a view to measuring the benefits he has received from the labor of employés in continuing to carry on the operations of the corporation.   The damages and loss to the bondholder from a stoppage of the operations of a railroad would generally be greater than from the stoppage of the works of a mining company ; but whether greater or less, they stand upon the same footing as a measure of the benefit accruing to him from the labor which prevented their infliction upon him ; the difference is one of quantity and not of kind.

We have undertaken to state this doctrine as it has been declared in other jurisdictions, and there applied to railroad property ; and to give our reasons on general principles for the conclusion we have reached that that limitation of the doctrine is unsound, and that, of consequence, in our opinion, the equity is as salutary, and its effectuation is as practicable and necessary against the bondholders of private as against those of the public corporations.   The argument against this wider application of the doctrine which is based on the supposed fact that such application has not heretofore been made, is the same argument that stood in the way of the conclusion in *Fosdick v. Schall*, and was in that case entirely

demolished in respect of railroad corporations and their property; the same argument, indeed, that has had to be met and overthrown in every new application of equitable principles from the beginning, and which, had it been allowed to obtain and control would have left England and this country without the splendid system of equity jurisdiction which now embellishes the jurisprudence of both countries. It may be, as suggested, that courts have been very stupid or very much at fault in not making an earlier application of these principles to cases like the present one; but if so it is the same stupidity which delayed the declaration of the doctrine of *Fosdick v. Schall*, that in the early ages failed to recognize equity jurisprudence at all, and which upon the eventual establishment of the court of chancery stood in the way of the immediate development and application of all the principles of equity into a perfect system of equity jurisprudence which has not even yet been attained.

The broader application of the doctrine, which we are attempting to justify on what we regard as very plain and simple elementary principles of equity, will not lead to, involve or admit of any of the dire consequences which are suggested, as will be clearly seen upon reference to the limitations which those principles themselves involve and which we have endeavored to state with care and precision. It will not take the place of mechanic lien laws and the like, nor obviate the necessity or policy of such enactments. It will not in any sense encroach upon vested or contractual securities or rights. The principles upon which it rests, in the application of it which we are proposing, in and of themselves, mark a distinct line between the particular corporation cases to which it applies and the ordinary cases of mortgages on property, whether of individuals or corporations, to secure the payment of debts; and under it, there is not the slightest danger of the secured creditor in any case losing anything which he is entitled to on recognized principles of equity and good conscience.

We have examined all the authorities brought to light in the case, not to speak of the adjudications of this court, and none of them conflicts with our position except in matter of obvious *dicta* to which we have already referred.

We have proceeded thus far and to the conclusion indicated above without reference to or consideration of what has heretofore been said or decided by this court on the subject. Aside from the case of *Merchants' Bank of Atlanta v. Moore et al.*, 106 Ala. 646, there are two cases in our reports which are supposed to bear upon it. The first is that of *Meyer v. Johnston*, 53 Ala. 237. In this case it appears that the mortgagor of a railway executed a second mortgage on the property to secure money borrowed for the purpose of making permanent improvements upon it, and this money was so used. Of an effort made by the beneficiaries in the second mortgage to have their claim given a priority over the first mortgage debt, the court, by MANNING, J., said: "The claim of the complainants below for the value of the improvements made on the railroad is without just foundation. It would be a case of charging the mortgagee with improvements put on the mortgaged property by the mortgagor; which is wholly inadmissible." (p. 352.) The equitable principle of *Fosdick v. Schall* had not been formulated and expounded at the time of, nor was it urged in argument or at all considered by the court in, the decision of *Meyer v. Johnston*; nor indeed did the facts there involved present a case for its application. So that we feel entirely warranted in saying that that adjudication is not an authority against the so well established doctrine of *Fosdick v. Schall*, and the other cases in that line of authority.

The other case referred to is that of *Lehman Brothers v. Tallassee Manufacturing Co.*, 64 Ala. 567. In that case the equitable doctrine invoked by these petitioners was not only fully considered by this court, but it was reaffirmed and adopted, and its operation was expressly extended to the property of a *manufacturing* company then in the hands of a receiver appointed at the instance of the holders of the corporation's bonds which were secured by a deed of trust or mortgage on its property. BRICKELL, Chief Justice, delivered the opinion of the court, and, after quoting with approval the following language from the opinion of Judge WAITE in *Fosdick v. Schall*, viz.: "When a court of chancery is asked by railroad mortgagees to appoint a receiver of railroad property, pending proceedings for foreclosure, the court, in the exercise of a sound judicial discretion, may, as a

condition of issuing the necessary order, impose such terms in reference to the payment from the income, during the receivership, of outstanding debts for labor, supplies, equipment, or permanent improvement of the mortgaged property, as may, under the circumstances of the particular case, appear to be reasonable,'' went on to say : '' The further observation is made in reference to railroad mortgages, *which seems to us applicable to mortgages by manufacturing and commercial corporations, generally,* that they ' are comparatively new in the history of judicial proceedings. They are peculiar in their character and affect peculiar interest. The amounts involved are generally large, and the rights of the parties oftentimes complicated and conflicting. It rarely happens that a foreclosure is carried through to the end without some concessions of some parties from their strict legal rights, in order to secure advantages that could not otherwise be attained, and which it is supposed will operate for the general good of all who are interested. This results almost as a matter of necessity, from the peculiar circumstances which surround such . litigation.' '' And the Chief Justice in another connection said further : '' The general creditors then before · the court, under the circumstances, could properly for the convenience and interest of all, be required to concede the use of the property belonging to the mortgagor but not covered by the mortgage from their strict legal rights to it, and its immediate reduction to money by a sale ; *as the mortgagees could be required to concede* for their strict legal rights, *that from the earnings of the mortgaged property outstanding debts for labor, supplies, &c., should be paid.*''—64 Ala. 596, *et seq.*

The case of *Merchants' Bank of Atlanta v. Moore et al.,* 106 Ala. 646, referred to above, goes upon certain *dicta* of Judge BREWER in *Kneeland v. Trust Co.*, 136 U. S. 89, which we have already considered, to the conclusion that the doctrine under consideration cannot be applied to other than railroad corporations. That conclusion is, we think, at war with our own case of *Lehman Bros. v. Tallassee Manufacturing Co.*, 64 Ala. 567, *supra*; and it appears to have been rendered without consideration, and certainly without discussion, of the broad and beneficent principles of equity which, not only support the doctrine in respect of railway corporations but, with

equal force, require its extension to all corporations, which, as shown by deeds of trust or mortgages to secure bonds, it is in the contemplation and to the interest of the parties, the mortgagor and bondholders, should be kept going; and this without at all impinging upon the sacredness of the vested rights of the bondholders. We are now of opinion that what is said in that case in limitation of the doctrine to railroads is unsound in principle, and must be modified so as to comport with the views we now announce. And we will return to and reaffirm the decision in *Lehman Brothers v. Tallassee Manufacturing Company*, and upon that, in connection with the general equities to which we have adverted, we do not hesitate to apply the doctrine of *Fosdick v. Schall* to the property of the defendant corporation, though it be only a mining and coke manufacturing concern, now in the hands of the receivers appointed at the instance of the trustee in the deeds of trust, if the petition presents the particular facts which are essential elements of the equity petitioners invoke and rely upon. To return then to the petition : We find no averment in it of any such improvement or betterment of the mortgaged property by the laborers whose wages are unpaid, and to whose claims petitioners have succeeded, as would entitle them to priority over the bondholders. There are averments of repairs to the coke ovens and to the railroad; but mere casual and incidental repairs such as are implied here, the mere mending a break or defect caused by current use, &c., are not improvements or betterments within the rule we are considering. The improvements must be of such character as to add a value in a sense permanent to the property, so that the security of the bonds is thereby increased, before the bondholders can be called upon to make restitution of that value to the laborers.

Nor do we find that a case is made under the third statement of facts supporting this equity above. It is said that the labor was necessary to continue the business of the corporation, but it is not shown either that such continuance was to the advantage of the bondholders, or necessary in conservation of their interests, or that any income, out of which, or because of the receipt of which, the wages for this labor should be paid, had been realized by the receiver from his administra-

tion and operation of the business and works of the corporation. Hence no case is made under the third statement above of the facts constituting this equity.

But we do find an averment on information and belief that "there was due to the defendant at and before the time of the appointment of said receiver the sum of about $40,000, which was due for coal and coke sold by the defendant, and which was taken from said mine and manufactured in said ovens, and that said $40,000 represented the gross earnings of the defendant into which the labor of said employés and operatives entered, and that said employés performed work and labor in the mining of said coal and in manufacturing said coke, and which is referred to in this section." This averment is not objectionable because of being made on information and belief.—*Christian v. Amer. Freehold Land Mortgage Co.*, 92 Ala. 130 ; *Lucas v. Oliver*, 34 Ala. 626 ; *Nix v. Winter*, 25 Ala. 309. It is as definite as to amount as if the language had been "a large sum, to-wit, $40,000," which means about $40,000, and is a customary and sufficient mode of averring such facts. It is an averment that the company when the receiver was appointed held and owned claims for products sold, bills receivable, for about $40,000. *Prima facie* the parties owing these bills were solvent and the amounts against them were good. It is shown that the receivers were authorized and directed to take into their possession all the property of the corporation, special reference being made to assets of this kind, and that they did take possession of all its property of every kind. It is probable these accounts have been collected, but whether so or not, they or their proceeds constitute the "moneyed assets that have been taken from the company," spoken of by Judge WAITE as the class of assets upon which ordinarily the power to give laborers priority of payment over bondholders is exercised. The petition shows that these "moneyed assets" belonged to and were a part of the gross earnings of the corporation. They, therefore, belonged to the employés in preference to the bondholders. If they are still uncollected in the hands of the receiver, the petitioners are entitled to have their claims charged upon them under the general prayer for relief. If they have been collected and the money is in the hands of the receiver, petitioners are entitled to

[Drennen v. Mercantile Trust & Deposit Co.]

have their debts paid out of it. And if their proceeds have been paid to the bondholders or expended in the administration of the receivership, the claims of the petitioners should be made a charge on the *corpus* of the mortgaged property, and paid out of the first moneys coming into the hands of the receiver, as specially prayed in the petition.

The claims of the petitioners being for labor done within six months before the appointment of the receiver come within the strictest rule declared by any of the cases as to time.—5 Thomp. Corp., § 7115.

No objection to the relief prayed can be based upon the fact that petitioners claim as assignees of the employès.—5 Thomp. Corp., § 7117.

The petition prays that notice of its filing be given to the parties to the pending suit. This was, in our opinion, sufficient in respect of making parties to the intervention, and the objection in this connection taken by the demurrer is untenable.

Finally, our conclusion is that the petition made a case for the relief as shown above, and the demurrer to it should not have been sustained. The decree of the city court is, therefore, reversed, the demurrer to the petition as a whole is overruled, and the cause is remanded.

Reversed, rendered and remanded.

COLEMAN, J., dissenting.—The Mary Lee Coal & Railway Company, a corporation, authorized by its charter to own and operate coal mines, coke ovens and a railway, in Jefferson county, to secure its bonded indebtedness executed a deed of trust to the Mercantile Trust & Deposit Company, the appellee, upon all its property, and tolls, charges, and its income. Having defaulted, the trustee filed a bill, praying for a receiver, and foreclosure of the mortgage. Pending the foreclosure bill, the appellants, Drennen & Company, by petition interposed a claim for fourteen thousand, six hundred and ninety-seven dollars, and prayed that it be allowed as a preferred claim. The basis of this claim is, that it was "due for repairs and work and labor done and performed for the defendant, the Mary Lee Coal & Railway Company, during the months of July, August, September, October and November," preceding the fil-

ing of the bill. Of the amount claimed, about $8,947 was due for digging and mining and shipping coal, and in keeping said mine in operation and in preparing said coal for shipment; that about $5,000 was due in operating and repairing said coke ovens, and in preparing coke for shipment to market, and about $750 was due for operating and repairing defendant's said railroad. The real issue involved, is whether the doctrine believed to have been first promulgated in the case of *Fosdick v. Schall*, 99 U. S. 235, which allowed wages earned within six months before the appointment of a receiver, preference and priority over the bondholders whose debts were secured by a mortgage preceding the accrual of the claim for wages, and which doctrine, by that decision and others since rendered, was expressly limited to public railroads, shall be further extended, and as extended be applied to private business corporations, companies and individual transactions. The principle asserted and the rule adopted for its application in the opinion of the court, logically leads to this result. No case has been cited in support of the contention, and the writer believes it is without precedent.

New and useful inventions for the benefit of mankind are commendable, but the province of courts is to apply existing principles, and not create rules and principles which injuriously affect the rights of parties, acquired by contract. The province and power of courts of equity to intervene for the protection of right and prevention of wrong, and to invent remedies where none exist, to secure these ends, is one of its most useful attributes, and the exercise of this power on proper occasions, has developed into our present admirable system of equity jurisprudence; but there is a great and irreconcilable difference between the application of a remedy, and the creation of a right and priority, which subverts and subordinates existing contractual interest. It has been truly said, that under some circumstances courts of equity may amplify remedies, but cannot dispense with legislation, nor amplify jurisdiction. The reasons now assigned for this new departure, have been obvious to the judicial mind for a century or more, and the very fact, that the conclusion has not hitherto been accepted as sound and permissible, of itself is full of warning to that conservatism which should characterize courts of

[Drennen v. Mercantile Trust & Deposit Co.]

justice. Precedents, though not always entitled to ab-
solute domination, when they have become so established
as to enter into and become elements of contract, cannot
be set aside by courts without inflicting injustice. The
legislative department has no authority, by its enact-
ments, to impair the obligation of contracts, and surely
courts of justice ought not, by their adjudications, to
adopt and apply principles to existing contracts, which will
have the effect of an *ex post facto* legislative enactment.
It is unnecessary to cite authority in support of a propo-
sition of law, recognized in all courts and especially
in this State, to the effect that in the absence of an agree-
ment to the contrary, at common law, a mortgage upon
property carried with it all subsequent improvements,
repairs and betterments, and this rule prevails until
changed by statute in courts of equity as well as law in
all States, where the common law exists. Nor is it
necessary at this late day, to cite the authorities which
have upheld the validity of mortgages, including those
of railroads upon after acquired property, and tolls and
charges and incomes. It was the prevalence of these
rules, which led to the enactment of what are known as
the mechanics' and material-men's lien laws and statutes,
giving priority for labor and supplies and materials, the
constitutionality and application of which statutes have
undergone so many exhaustive discussions in the courts
of the country. In no case that is now recalled have
these statutes been sustained in so far as they were in-
tended to "displace" or subordinate prior liens and con-
tracts ; nor can there be found a decision, in my opinion,
which demanded of the owner of a right, vested in him
by virtue of a prior valid contract, that he concede some-
thing of his rights, as a condition precedent to his ob-
taining the aid of the courts of the country. I am not
now construing the question of the unqualified right of
a suitor to a receiver in a proper case, and the terms a
court may impose as a condition to the appointment of
a receiver, nor the power of a court to create prior liens
for the preservation of property held by it during the
pendency of litigation. The principle asserted in the
case under consideration, goes far beyond all these rules
and regulations incident to the appointment of receivers
and the preservation of property. It boldly announces
as a universal principle of "abstract equity," not de-

pendent upon contract nor affected by contract, "and which needs no other justification for its application in any case than the existence of facts upon which it arises and rests." I quote from the opinion itself as follows: "Enough has, we think, been said by ourselves and through our adoption of the language of Judge WAITE to demonstrate that the equity of the doctrine lies solely in the facts that the gross income of the corporation which in good conscience belongs to its laborers and operatives has been, in one form or another, diverted from them and converted directly or indirectly to the use, benefit and behoof of the bondholders to whom in equity and good conscience it does not belong, whether the mortgages securing the bonds in terms embrace income or not, until the wages of laborers and operatives and the accounts of supply or material-men for labor done and supplies furnished recently before the appointment of the receiver have been paid. And this is the whole equity, and it is in itself a perfect equity. The fact that the corporation is of a public character does not enter into it and is not an element of it, any more than such fact would be necessary to a recovery in trover for a horse converted by a corporation. Every element of this equity may exist as well against a private as against a public corporation, and against bond creditors of the one as well as the other. The right to be asserted is obviously the same whatever the character in this respect of the corporation. The wrong done to the employès is the same—the misappropriation of the fund for the payment of their wages. And the remedy for the effectuation of the right and the redress of the wrong is applied upon considerations which take no account of whether the corporation whose earnings have thus been wrongfully diverted from the payment of its employés is a railroad company, a manufacturing company or a mining company. The diversion of the fund being shown and the equity being thus made to appear, the redress is accorded, the equity is declared and effectuated by courts of chancery upon the broad and beneficent maxim of equity jurisprudence which imposes, or authorizes the court to impose, upon every suitor asking equitable relief the duty and burden of doing equity, and we have not heard or seen it suggested that this principle is applicable more to one suitor

than another or more to a public than a private corpora-
tion.    The necessity for the application of this equitable
doctrine for giving preference to claims of employès for
wages is doubtless more frequent in railroad cases, but
that does not argue that the facts which authorize it
cannot as well exist in other cases.    So there is more
necessity ordinarily for a railroad corporation to be kept
a going concern because of the duty it owes the public
and the character of its business, and hence it is true
that the facts stated constituting the equity of the
doctrine in the third category, *supra*, exist more fre-
quently in respect of railroad property.    But there may
well be, from the point of view of the bondholders, as
much necessity to keep the works of a private corpora-
tion going in order to protect and preserve the property
which is the bondholders' security as also to earn income
for the payment of current expenses and the principal
and interest of the bonds.    And the necessity of keeping
the corporation a going concern is in all cases gauged,
not from the standpoint of the public, but from the
standpoint of the bondholders, and for the purpose of
determining, not what injury the public would have
suffered from the stoppage of the works, nor how they
have been benefitted by the continuation of the business,
but what injury the bondholder would have suffered
from such stoppage in the loss of net income and in the
diminution of the value of the property, with a view to
measuring the benefits he has received from the labor of
employès in continuing to carry on the operations
of the corporation.    The damages and loss to the
bondholder from a stoppage of the operations of a
railroad would generally be greater than from the stop-
page of the works of a mining company; but whether
greater or less they stand upon the same footing as a
measure of the benefit accruing to him from the labor
which prevented their infliction upon him; the difference
is one of quantity and not of kind." It must be ob-
served that the "equity" here asserted, is not made to
depend upon any statute, or agreement to that effect, in
favor of the "wages of laborers and operatives and the
accounts of supply or material-men for labor done and
and supplies furnished recently before the appointment
of the receiver;" and until paid made a prior charge
upon the gross income proceeding from such considera-

tion, or if such income has been otherwise expended then upon the corpus into which consideration entered. The predicate for the argument is, "that the gross income *belongs* to the laborers and operatives and material-men, which in one form or another has been diverted from them and converted directly or indirectly to the use, benefit and behoof of the bondholders, to whom *in equity and good conscience it does not belong*, whether the mortgages securing the bonds in terms embrace income or not until these wages and material-men have been paid." We have italicized the words which are made the pillars of the argument. Is it a fact, that the gross income covered by a prior executed mortgage, known to the parties, belongs in any sense to the laborer or material-man as a matter of equal or equitable right; and that it does not belong to the bondholder, although by contract he has secured a prior lien, which lien existed, and which the laborer and material-men knew existed when the services were rendered and the supplies or material were furnished? Have we discovered or invented a legal X-ray which exposes to the judicial eye an imperfection in the old doctrine of contract on personal credit, or manifests as unsound, the rule which declares contracts to be sacred and inviolable? If the income *belongs* to the laborer he ought to be able to recover it in an action for money had and received, and not by a judgment for services rendered. If he or the material-man has a lien upon or prior claim to the income, or upon the "corpus into which the labor or material has entered," as an "abstract" and "perfect equity," independent of contract or statute, the judicial mind for a century or more has been grossly at fault. The interventions of legislatures to provide for labor and material furnished, and the study and worry of courts to adjust the rights of contractors and prior mortgagees under these statutory enactments, were to a great degree superfluous and labor lost, for if the doctrine now contended for be sound, there arose from the facts, without the statute, or agreement, a perfect equity, which only needed application and enforcement. If the doctrine now contended for is sound, there must arise on every farm, in every manufactory, mine and enterprise in which labor is performed and material furnished from which a gross income is derived, the same rights and

equity, independent of and superior to the claims of all other creditors without regard to previous or subsequent contracts. If the perfect equity exist, the arbitrary limitation by some courts to six months within which such claims may be enforced is a tyrannical usurpation by the courts. We can not reasonably presume that the distinguished court which rendered the decision of *Fosdick v. Schall*, 99 U. S. 235, *supra*, and subsequent decisions in line with it, did not clearly perceive the full force of the argument and "abstract equity" now insisted upon successfully for the first time in this or any other court, at least within the knowledge of the writer, and apprehend the nature and consequences involved. That court did not attempt to justify the new rule adopted upon the ground that the petitioners had an abstract equity, perfect in itself, superior to the bondholders, but based its conclusion upon the power of the court to impose conditions precedent to the appointment of receivers and the granting of equitable relief, and justified the imposition of these conditions because of the public character of railroad corporations, and limited its application to such enterprises, and to cases in which the mortgagee applied to courts of equity for affirmative relief. In the case of *Kneeland v. Trust Company*, 136 U. S. 89, that court has already issued its warning, that the rule will not be extended to other than the exceptional case specified, and reaffirmed the established doctrine in the following language : "No one is bound to sell to a railroad company or to work for it, and whoever has dealings with a company whose property is mortgaged must be assumed to have dealt with it on the faith of its personal responsibility, and not in expectation of subsequently displacing the priority of the mortgage lien." How is it possible to reconcile the doctrine enunciated in *Kneeland v. Trust Co.*, 136 U. S. *supra*, with that enunciated in the case at bar, where the rule is applied to "improvements which add value in a sense permanent to the property," and which holds that if the income has been otherwise expended, then these claims become a prior lien upon the "corpus" to which the labor or materials of claimants contributed nothing, and which originally constituted the security of the mortgage? The writer can not sanction as sound a rule of equity which annuls (usually termed "dis-

places'') existing relations between a mortgagor and mortgagee, in the interest of a third party, whose interest was acquired against the mortgagor, subsequent to and with a full knowledge of the rights of the mortgagee.

The justification of the courts, denying a mortgagee his priority, has been rested mainly upon, first, the equitable doctrine, that he who seeks equity must do equity, and secondly, upon the equitable doctrine of estoppel, and thirdly, that the claim is one of abstract right arising from certain conditions and circumstances.

As to the first of these propositions, that he who seeks the aid of a court of equity must do equity, the rule operates only between the parties to an agreement or transaction to prevent the one from taking an undue advantage of another, but can not be invoked by a stranger, who is not even a proper party to the suit. But the argument assumes the question in controversy, and that is, that these claimants have an equity peculiar to them because of the character of the claims. These claims must necessarily arise either from contract, express or implied, or from statute, or result into such superior claims as matter of law from facts. It is not pretended that the right is of statutory creation, or of contract between the parties, the mortgagee and labor or material creditor, nor between the mortgagor as the agent of the mortgagee, and the labor or material creditor.

Is it a conclusion of law that a mortgagee guarantees to laborers and material-men, that the business of the company or corporation will be conducted on business principles, and the company never become insolvent? Is it a conclusion of law that a mortgagee's lien shall be subordinate to claims for labor and material? Is it a conclusion of law that a lien upon incomes acquired by solemn contract is subordinate to such claims? And on the other hand, is the right of the laborer or material-man made by law to depend upon the skill and judgment of the employer, so that if permanent injury results his claim becomes thereby of a higher and superior character? or does it depend upon how the gross income be expended by the employer? If this be law, it is because the courts make it law, and in no sense is it the application of any just principle.

[Drennen v. Mercantile Trust & Deposit Co.]

Contracts for labor and material, unaided by special provision of the contract or statute, stand on no higher ground than other simple contract creditors, and are no more entitled. to the income than the latter creditors. Labor and material claimants have as much right to have a simple contract creditor, to whom income has been paid, declared a trustee for their benefit, as to have a mortgagee who has a lien upon it to whom it has been paid declared such trustee.

There is not a single element of an estoppel in the whole matter. Neither the laborer nor the material-man acts, or refrains from acting, at the instance of the mortgagee. It is a question of contract between them and the mortgagor in a matter not under the control or supervision of the mortgagee, and rendered with a full knowledge of the mortgagee's lien. It would require affirmative action on the part of the mortgagee, inducing the labor and purchase, to raise an estoppel against him.

The new doctrine is a revolution in jurisprudence, subverting settled principles, and not the application of new remedies to existing rights, and it should be walled into the "exceptional cases" declared to be such by Mr. Justice BREWER in *Kneeland's Case*, 136 U. S. 89, and re-asserted in *Thomas v. Western Car Co.* in 146 U. S. 95.

In the case of *Wood v. Guarantee Co.*, 126 U. S. 416, 421, it was declared that three conditions must exist to justify the application of the rule of *Fosdick v. Schall*: first, it must be applied wholly to "operating expenses," and, second, only where there is a "diversion of the income of a going concern," and third, "that it had never been applied in any case except that of a railroad, and that there was a broad distinction between such a case and that of a purely private concern."

In the case of the *National Bank of Augusta v. Carolina Railroad*, 63 Fed. Rep. 25, the application of the rule is limited to railroads. It is said: "The theory of the equity is this, it is the interest of the public, as well as all parties interested in a railroad, that it be kept a going concern. To do this there must be a ready supply of labor and material necessary to this end. If persons who give labor and materials were required in every instance to make careful examination into the condition of the company, so as to ascertain its solvency and capacity for paying debts, all of its operations might be brought to a

stand still. For this reason persons dealing with a company are encouraged to do so, with the knowledge that the court will see that such supplies and materials are provided for. But in exercising this equity, the court goes upon dangerous grounds, and, therefore, proceeds cautiously keeping rigidly within prescribed limits."

In the case of *Hanna v. State Trust*, 70 Fed. Rep. 2, an attempt was made to invoke and apply the rule of *Fosdick v. Schall* to a private company or corporation. It was said : "The doctrine of these cases has no application to the case at bar. They rest upon the peculiar character of railroad property and railroad corporations. The distinction between railroad corporations, which are of a *quasi* public character, and purely private corporations has been often pointed out. It is enough to say that the Supreme Court itself has said, that the doctrine has only been applied in railroad cases." A lengthy quotation is made in the opinion from the case of *Raht v. Attrill*, 106 N. Y. 423, in point, and quite a number of decisions from other courts are also cited.

In *Coe v. Midland Railway Co.*, 31 N. J. Eq. 105, the question of the application of the rule to private business enterprises and the consequences is fully discussed and disapproved. Also in *Poland, Trustee, v. Lamoille Valley R. R. Co.*, 52 Vermont, 144. Without a single exception, so far as the writer has been able to ascertain after a most diligent investigation, the courts are uniform in applying and limiting the rule wholly to railroad cases ; and in the case of *Thomas v. The Western Car Co.*, 146 U. S. 95, believed to be the last utterance of the Supreme Court of the United States on the question, a lengthy quotation is made from the case of *Kneeland*, 136 U. S., *supra*, in which the warning given in that case, and the limitation placed upon the rule, was repeated with approbation and re-asserted.

The application of the rule was denied as to manufacturing corporations, in *Fidelity Ins. Co. v. Shenandoah Iron Co.*, 42 Fed. Rep. 372, and in *Bank v. Shenandoah Co.*, 35 Fed. Rep. 436. In Cook on Stockholders, section 861, p. 1402, it is said the rule "is extraordinary," and "does not apply to manufacturing companies." The principle is criticised as to its application in railroad cases, and it is held that it "plainly impairs the

obligation of the mortgage contract" by the following eminent texts : Wait on Insolvent Corporations, §§ 280–281 ; Beech on Receivers, §§ 391–393 ; High on Receivers, § 294a ; Jones on Corporate Bonds, § 555. Surely the rule ought not to be extended by adjudications of a court, as it has been in the case before us, in the face of such high authority, and in defiance of the obligations of contracts.

.If the equitable right exist as an abstract right, the parties themselves can come into the courts and insist upon its protection, and need not wait for the bond-holder or mortgagee. That I have not overstated the position of this court, may be seen by a reference to the case of *Merchants Bank v. Moore et al.*, 106 Ala. 646, which the present opinion and decision of the court declares to be unsound. In that case, there was no question of a bondholder or prior lien claimed by contract. A general creditors' bill was filed on behalf of all creditors and a decree rendered, which declared a conveyance made by the defendant in favor of certain creditors to be a general assignment for the like benefit of all creditors. The defendant debtor had been engaged in sawing and planing lumber for a market, a mere private business concern. It was not continued or asked to be continued as a "going concern." Moore and others filed their petition in which they claimed that the company was indebted to them for labor and materials, which entered into the "permanent improvement" of the property which had been assigned for the benefit of creditors, and which fact petitioners asserted gave them a priority over the other general creditors. There was no claim of priority by virtue of any contract or statutory lien ; but the contention was based purely and solely upon the one fact, that their labor and materials entered into the permanent improvement of the property. This court held that these facts did not entitle them to a priority over the other creditors. Certainly this has been the uniform holding of this court under like circumstances from its organization, and now it is proposed to declare different principles and annul long established rule of parties contracting on a personal credit, and lay down the new rule, that labor performed or materials furnished which enter into the improvement of property, creates a perfect equity, which entitles that class of creditors to a

priority over other creditors, without regard to the terms of the contract or provisions of statutes. The very improvements may have been the basis of credit, and the credit given without any notice or knowledge of the existence of claims for labor or material. The writer of the opinion in the case of *Merchants Bank v. Moore, supra*, did not at the time suppose there was any conflict between that case, and that of *Tallassee Mfg. Co.*, 64 Ala. 567 ; and after a careful re-examination, believes it to be demonstrable beyond reasonable controversy, that there is no conflict upon any issue involved and decided in these cases. In the case of the *Tallassee Mfg. Co.* there were three different creditors who appealed from the decree of the chancery court to this court, Lehman Bros., Clopton *et al.* and Stone & Clopton. Lehman Bros. appealed upon the grounds that the chancery court held that they were not *bona fide* holders of certain bonds, which were in their hands as collateral security, and that Lehman Bros. & Co. were not entitled to the benefit of this security. There was no contest between the bondholders and mortgagees and Clopton *et al.* On the contrary, the bondholders acceded to the claim of Clopton *et al.*, and consented, so far as they were concerned, to the granting of the payment of this claim. The claim of Stone & Clopton was for an allowance of attorney's fees out of the general fund, not covered by any mortgage. The chancery court disallowed this claim. The other claim was that of Clopton, Goldthwaite *et al.*, and arose from the following facts : The Tallassee Manufacturing Company was financially pressed and unable to raise money. It had hypothecated certain cotton which was needed for manufacturing purposes. It was at that time a "going concern." In order to release the cotton and get possession of it, for the use and benefit of the company, with the consent of the trustees and assignees, and with the understanding had with these parties that they were to be repaid as appears from the pleadings, these parties, upon their individual responsibility, raised the money for the purpose of releasing the cotton. There was no litigation in the case whatever between the bondholders and mortgagees, on the one hand, and other creditors, but the contest was solely between general creditors, the petitioners as such claiming priority of payment over other

unsecured creditors, upon the facts stated, just as in the case of *Bank v. Moore*, 106 Ala. *supra*, out of the property, or proceeds of property, not covered by any mortgage or lien. It was conceded throughout the opinion, and by all the creditors, that the bondholders were entitled to everything covered by their mortgage, and the opinion of the court was careful to keep separate, not only the property itself covered by the mortgage, but the income from this source, so far as it could be separated from the income derived from property not mortgaged for the benefit of the bondholder. The phase of the litigation applicable to the case under consideration arose only between unsecured creditors as to their rights in the property and the income from property not included in the mortgage. Clopton, Goldthwaite *et al.* claimed that the facts gave them a preference over the other unsecured creditors, as to the property not included in the mortgage. They set up no claim to property covered by the mortgage. The chancery court denied their right to any preference whatever. This ruling was affirmed on appeal. The one or other of the two conclusions follows : either, that the claim of Clopton, Goldthwaite *et al.* was not a claim similar to that preferred by Moore *et al* in *Merchants Bank v. Moore, supra* ; or if it was similar, then the decision of this court affirming the decision of the chancery court, which had denied and refused to decree a priority to petitioner, is directly in harmony with the case of *Merchants Bank v. Moore*, and directly at variance with the new doctrine. On the other hand, if the claim of Clopton, Goldthwaite *et al.* was not of a similar character and did not rest upon like circumstances, the decision is not an authority upon the question at issue, for there was no such question before the court, to be adjudicated. The only ground for the reversal of the case of *In re Tallassee Mfg. Co.*, 64 Ala. 567, *supra*, was the error of the chancery court in holding that Lehman Bros. were not *bona fide* holders of the bonds. In all other respects the case was affirmed. It is impossible to find any conflict in the case of *Bank v. Moore et al.*, 106 Ala. 646, *supra*, and *In re Tallassee*, 64 Ala. 567, as to any issue involved in either case. The writer is aware that counsel for Clopton, Goldthwaite *et al.*, in written argument filed, insisted that their claim was within the principle declared

in *Fosdick v. Schall,* and cited that case in their brief, and this no doubt led to a discussion, in the opinion of this court, to some extent, of that case and the principle insisted upon, but it is apparent that this court did not apply or undertake to enforce the doctrine *In re Tallassee,* for the priority of the claim was denied. What was said in the opinion as to extending the rule of *Fosdick v. Schall* to manufacturing enterprises, was merely dictum. It will also be seen that the court placed the power of the court to grant the relief not upon any abstract right or equity of claimants, but its authority to require a concession, as a condition precedent to granting relief. In the carefully considered case of *Meyer v. Johnston,* 53 Ala. 237, many of the principles involved in this discussion arose. On page 323, the rights and property embraced in the mortgage were considered. The mortgage conveyed all property, real and personal, then owned, or which might thereafter be owned, and all "tolls, incomes and profits." This court reaffirmed the validity of such conveyances, and declared that the rights of the mortgagees were superior to subsequent claims for improvements and even for the construction and completion of the railroad itself. Extensive quotations were made from the cases of *Dunham v. Railway,* 1 Wall. 254, and *Railway Company v. Cowdrey,* 11 Wall. 481, which are directly in point, and many other authorities were cited. In the case of *Cowdrey,* 11 Wall. *supra,* the claim rested upon the fact that it was for iron laid upon the road and capital applied to the road, without which the road could not have been operated. The court held the claim subordinate to that of the mortgagee. As a conclusion, the court used the following language: "If the railroad company itself, the corporation created by the state to build, equip and operate a work useful to the public though belonging to the company, can not when its enterprise is about to fail and its labor and expenditure to be lost, give to those who shall come to its aid, and help to complete it * * * * obligations which should have priority over others previously contracted, what prerogative of a court of equity entitles the chancellor to step in and do so, instead of the company? The company may not do so, because holding that contracts should be inviolable the law will not permit the obligations of them to be impaired."

[Drennen v. Mercantile Trust & Deposit Co.]

On page 352 this court expressly repudiated the doctrine that the mortgagee could be charged with improvements put upon the mortgaged property. The opinion as a whole is in direct conflict with the principle now being asserted. It is clear, from the authorities of this State and elsewhere, that when the Mary Lee Coal & Railway Company executed its mortgage to the Mercantile Trust & Deposit Company, its mortgage was valid as a conveyance upon all its property, and upon "income and tolls," and that this principle of law entered into as a constituent of that contract. That this prior right, acquired by a solemn contract, can not be displaced in favor of the claims of petitioner subsequently accruing, and which in the absence of agreement must be presumed to have been rendered upon the personal obligation of the mortgagor, without impairing the obligation of the mortgage contract, is too clear to admit of controversy. It is the doctrine of all the courts. Even in the cases where the rule has been enforced against a prior mortgage, the courts concede that the effect of the application of the rule is to *"displace"* prior liens, and the *"displacement"* is justified solely upon the ground that courts of equity may demand from the mortgagee, as a condition precedent to relief either in the appointment of a receiver or foreclosure, that he concede or consent to the final payment of the claim of the laborer and material-man, although by virtue of the mortgage, the lien, in fact and in law, is prior and superior to any claim for labor or supplies, realizing that the priority could not be adjudicated upon any principle of "abstract equity." So apparent was it, that the innovation impaired the obligation of contracts, the courts limited the application of the "condition precedent" to railroads because of their public character, and to "going railroads," and where there was a "diversion" of income. How it can be, that the application of assets, whether money or property, to the satisfaction of a mortgage, which by valid contract known to all parties is a first lien upon it, is a "diversion" of assets, remains yet to be sustained. There is much force in the position, that the public have great interest in railroads, and that no one should be allowed to strike down without warning the public interest. This question is one not simply of debtor and creditor growing out of contract, but of com-

merce itself. Many States have provided for these conditions by statute, and saved their courts from the imputation of "court made law."—*Central Trust Co. v. Thurman*, 20 S. E. Rep. (94 Ga.) 141. Whether the same results as to impairing the obligations of contracts would follow as to railroad mortgages executed since the promulgation of the rule of *Fosdick v. Schall*, we need not now consider. We have no such case before us. In the case of *Meyer v. Johnston*, the same distinction was drawn as to railroad corporations, on the ground that the public were interested in such enterprises, as that drawn in *Fosdick v. Schall*; and upon this ground the giving of a prior lien to receiver's certificates was upheld. It is said that when *Meyer v. Johnston* was rendered, the case of *Fosdick v. Schall* had not been established. That is no argument. The same equity existed then, and it was directly repudiated. But that argument is further stripped of all force, when we consider the final determination of the case. The law of this State at that time required this court on a second appeal, to render judgment without being bound by the first appeal. When the case of *Meyer v. Johnston* came up on a second appeal (64 Ala. 603), it seems that the opinion in the case of *Fosdick v. Schall* had been delivered. We can not doubt that the learned counsel, representing the interest which had been adversely decided, would have availed themselves of the new doctrine had it been supposed to have been so far reaching. The same members of the court presided on the first appeal as on the second, and also when the case of *In re Tallassee Mfg. Co.*, 64 Ala. 567, was decided.

What the attitude of this court should be when a case like that of *Fosdick v. Schall* comes before it, need not now be considered; but in my opinion, the rule can not be extended to cases like that before us without violating the sacredness of contracts. The rule declared in *Bank v. Moore*, 106 Ala. 646, which strictly followed the decision of *Meyer v. Johnston*, ought to be adhered to. Certainly if there was any conflict between the case of *The Bank v. Moore et al.* and the case of *In re Tallassee*, the same conflict exists between the latter case and the case of *Meyer v. Johnston*, and which, if there be such conflict, was virtually overruled, without any reference

[Hines *et al.* v. Chicago Building & Manufacturing Co.]

to it. In my opinion, there is no conflict in any of the decisions previous to that rendered in the case at bar.

HEAD, J., concurs in the dissenting opinion.