GEORGE LeHOTE, RECEIVER, ETC., *v.* HAYWOOD A. BOYET
ET AL.

CORPORATIONS.  *Insolvency.    Receiver.    Laborers' wages.    Preference
claims.*

Where a receiver is appointed for an insolvent corporation, wheth- er public or private, and its entire property is placed in his hands, he will be required to pay the wages of laborers who rendered service shortly before his appointment and whose labor was necessary to continue the business of the corporation and preserve its property, in preference to both ordinary and mortgage creditors.

FROM the chancery court of Hancock county.

HON. JAMES F. McCOOL, Chancellor.

Boyet and one hundred and five other persons, the appellees, laborers, petitioned the chancery court in a case therein pending

in which was being administered the estate of an insolvent private corporation, which had been engaged in the manufacture of lumber, showing that they were creditors of the corporation for wages due them as laborers, and praying that the receiver, LeHote, the appellant, be ordered to pay them in preference to all other creditors. From a decree granting the prayer of the petition, the receiver, LeHote, appealed to the supreme court.

It appeared that the insolvent corporation had made a partial assignment for the benefit of its creditors, including the appellees, which did not give preferences, but it recognized existing liens on the property conveyed, and that it was indebted to each of the petitioners on account of wages due them as laborers, the aggregate sum being $2,049.50; that the labor was performed at various dates between April 1, 1904 (the earliest date), and July 7, 1904, and that the service of these laborers were necessary to continue the business and preserve the property of the corporation. The receiver was appointed July 9, 1904.

*T. M. Miller; E. J. Bowers,* and *D. B. Chaffee,* for appellant.

It would seem to be enough to say that inasmuch as the law of the state providing liens contained no provision in favor of laborers which would apply to any of the assigned property, and inasmuch as the assignment itself was for the equal benefit of all creditors and is not assailed, no preference can be allowed these appellees over the others.

The effect of the decree here, if permitted to stand, would partially nullify the assignment and would create a lien at the same time where the statutes, which undertook to deal with the entire policy, give none.

It is not denied, and cannot be denied, that the Favre Lumber Company had a perfect right to assign its property for the payment of all its creditors. The effect of the assignment was, therefore, to vest the title to the property in trust for all creditors, including the petitioners themselves. The circumstance

that the trustee resigned or abandoned the trust produced a condition which rendered the action of the court a matter of necessity, and not of grace; for it is a maxim of equity that no trust will be permitted to fail for want of a trustee.

The cases relied on by counsel, and accepted as authoritative by the chancellor, were those where, in the first place, the labor by "hand-to-mouth" people had been rendered to keep alive some valuable franchise, and where the parties seeking the benefit of the court's discretion in the appointment of a receiver, as incidental to a foreclosure proceeding, were the beneficiaries of the labor. A sort of equity of subrogation, in short, was worked out against them in favor of a meritorious class of supposedly needy employes, based very largely upon the notion that inasmuch as the court was not absolutely bound to appoint a receiver, and thereby put the property out of the reach of legal process in favor of the labor claimants, it had the power to annex, as a condition of interfering with the possession of the mortgagor, as it were, that the mortgagee should submit to a preference in favor of such worthy persons. Here there was no attempt to take property out of the hands of the debtor defendant; the same had already been so lawfully disposed of as to render it inaccessible to the laborers by any process save in a suit where fraud or other illegality could be successfully charged against the assignment.

The case considered the leading one on the subject is that of *Fosdick* v. *Schall,* 99 U. S., 235, which related to a claim against a railroad company for the rent of cars. And in speaking of the power of the court, in the absence of a lien, to apply the revenues in the hands of the receiver to its payment to the prejudice of a mortgage, the court said, *inter alia:* "The power rests upon the fact that in the administration of the affairs of the company the mortgage creditors have gotten possession of that which, in equity, belonged to a whole or a part of the general creditors. Whatever is done, therefore, must be with a view to a restoration by the mortgage creditors of that which

they have thus inequitably obtained" (referring to earnings and betterments).

In that case, as well as in the case of *Hale* v. *Frost,* 99 U. S., 389, and *Burnham* v. *Bowen,* 111 U. S., 776, it appeared that the claims allowed against the receiver of the railways would have been paid in due course of business from the earnings, if the mortgagor's possession had continued uninterrupted by the receivership, whereas here there was no possession of the original owner disturbed by a receiver, and there was no longer any chance for the debts to be paid.

We think that an examination of the cases relied on by opposing counsel will develop that there is no room here for the equity applied as a matter of grace and as a supposed condition of asking equity and thus diverting funds from the ordinary use the owner would have made of same if permitted to remain in their administration.

The Alabama case relied on proceeds on the same principle, and only goes beyond the supreme court of the United States in applying it to a corporation not exclusively operating a public franchise.

Another matter is to be observed in the cases where the claims of persons furnishing labor and material to keep the railroad going were paid by. preference over the mortgages from the income in the receiver's hands, and that was the consideration that notwithstanding default in the payment of interest, entitling the mortgagees to foreclosure, the latter had allowed the property to remain in the hands of the company and had allowed the latter to contract the claims for the betterment of the road—a species of fraud on the creditors, who, presumably, would not have advanced credit except upon the faith of the income being applied to the payment of current expenses.

In *Woods* v. *Guarantee Trust & S. D. Co.,* 128 U. S., 421, the supreme court said: "The doctrine of *Fosdick* v. *Schall* has never been applied in any case except that of a railroad. The case lays great emphasis on the consideration that a railroad is

a peculiar property, of a public nature, and discharging a great public work. There is a broad distinction between such a case and that of a purely private concern. We do not undertake to decide the question here, but only point it out."

In no case has a purely private corporation in the hands of a receiver been charged with preferences that were not allowed by the state law; and as the law governing this class of corporations is essentially different in many respects from that governing *quasi* public corporations, the principles applied in the cases cited by our opponents have no application in law or reason to the case at bar.

: W. J. *Gex,* for appellees.

If the assignment was valid, which we seriously question and deny, because of the fact that the parties signing same do nowhere show any authority delegated to them by the stockholders, or even from the board of. directors, of said company to make the assignment—and certain it is that the secretary and president of any corporation have no such general powers—still, this would not affect the right of the chancellor to make the order, as entered in this cause, when he was subsequently called upon to appoint a receiver.

The assignment could not have the effect of prejudicing the lien or other security held by any creditor, still less could it have the right to restrict the jurisdiction of the chancery court, when the creditors themselves, as alleged in the petition for the appointment of the receiver, came into that court and prayed that a receiver be appointed in order to preserve the estate, the assignment being inadequate for that purpose.

Counsel say that the decree creates a lien when none is provided for in such cases. If they had been able to draw at any time during the progress of this litigation the distinction between a lien and a preference, this court would not now have this case before it. Counsel say, without citing any authority,·

that the appoinment of a receiver in this cause was a matter
of right, and not of grace. All the law books and decisions say
that the appointment of a receiver is always a matter of grace,
and never a matter of absolute right. 23 Am. & Eng. Ency.
Law, 1039, where in the notes the decisions of every state are
reviewed. The rights of the appellees and the decree in their
favor are abundantly supported by the highest authority.
*Fosdick* v. *Schall,* 99 U. S., 235 ; *Hale* v. *Frost,* 99 U. S., 389 ;
*Burnham* v. *Bowen,* 111 U. S., 776, 780, 783 ; *Union Trust
Co.* v. *Morrison,* 125 U. S., 591 ; *St. Louis, etc., R. Co.* v. *Cleve-
land, etc., R. Co.,* 125 U. S., 657, 673 ; *Kneeland* v. *Loan &
Trust Co.,* 136 U. S., 89 ; *Thomas* v. *Western Car Co.,* 149 U.
S., 95 ; *Virginia, etc., Co.* v. *Central Railroad & Banking Co.,*
170 U. S., 355, 365, 368 ; *Railroad Co.* v. *Carnegie Steel Co.,*
176 U. S., 257.

True it is that the cases above cited were all railroad cases,
and of necessity the decisions thereof do not set out specifically
that the same principle would apply to private corporations in
contradistinction to *quasi* public corporations; but it is to be
noted that these cases, whenever they deal with the proposition
as to whether the same principle would apply to private cor-
porations, expressly refuse to pass upon same as set out in
*Woods* v. *Guarantee Trust & S. D. Co.,* 128 U. S., 421, cited
by appellant.

As the question whether the same principle could apply to
private corporations has never been presented to the supreme
court of the United States, and therefore never by it passed
upon, we must look to the decisions of other courts of last
resort to which the question was presented and passed upon.

The leading case on the principles of *Fosdick* v. *Schall,* as
applied to private corporations, is the case of *Drennen* v. *Mer-
cantile Trust & Deposit Co.,* 115 Ala., 592 (s.c., 23 South.
Rep., 164), to which case we would most especially call the
court's attention. *Dickinson* v. *Saunders,* 129 Fed. Rep., 16.

85 Miss.—41

Whitfield, C. J., delivered the opinion of the court.

We think this case falls squarely within the principles announced in *Fosdick* v. *Schall,* 99 U. S., 235 (25 L. ed., 339); *Burnham* v. *Bowen,* 111 U. S., 776 (4 Sup. Ct., 675; 28 L. ed., 596); and *So. R. Co.* v. *Carnegie Steel Co.,* 176 U. S., 257 (20 Sup. Ct., 347; 44 L. ed., 458), all of which relate to railroads; and *Drennen & Co.* v. *Mercantile Trust & Deposit Co.,* 115 Ala., 592 (23 South. Rep., 164; 39 L. R. A., 623; 67 Am. St. Rep., 72), and *Dickinson* v. *Saunders,* 120 Fed. Rep., 16 (63 C. C. A., 666), which relate to private corporations. The supreme court of Alabama, adverting to the distinction sought to be drawn there, as in this case, between the application of the principle to public or *quasi* public corporations, on the one hand, and private corporations, on the other, said in the case in 115 Ala., 23 South. Rep., 39 L. R. A., 67 Am. St. Rep.: "To state the proposition yet more concretely, the equity arises and is rested upon one or another of the three following categories or states of fact: First, that the gross earnings of the corporation before the receivership, to which its operatives and laborers and persons furnishing necessary supplies are, upon all the authorities, entitled in preference and priority to the bondholders, have been diverted from the payment of their wages and accounts and paid to the bondholders or are in the hands of the receiver, to be paid to the bondholders, or to be expended by him in the further operation of the corporation's works for the benefit of the bondholders, or have been expended, either before or after receiver appointed, in the improvement and betterment of the mortgaged property, whereby the security of the bonds is increased, to the obvious advantage and benefit of the bondholders. Or, second, that whether, strictly speaking, there has been any diversion of gross earnings from the employes, directly or indirectly, to the bondholders, or not, the operatives and laborers have performed services and labor in the improvement and betterment of the mortgaged property, so that such labor and services have inured directly to the

benefit of the bondholders, in the enhancement of the value of
their security, and hence of their bonds, they thereby securing,
in addition to the property embraced in their mortgages, the
value of the services of the company's operatives and laborers,
which value belongs to such operatives and laborers, and would
have been paid to them, it is to be assumed, by the corporation,
out of its gross earnings, but for the intervention of the bond-
holders, and the appointment at their instance of the receiver."
The third ground need not be stated.   ".   .   .   The fact that
the corporation is of a public character does not enter into it,
and is not an element of it, any more than such fact would be
necessary to a recovery in trover for a horse converted by a cor-
poration.     Every element of this equity may exist as well
against a private as against a public corporation, and against
bond creditors of the one as well as the other.   The right to be
asserted is obviously the same, whatever the character in this
respect of the corporation.   The wrong done to the employes is
the same—the misappropriation of the fund for the payment
of their wages.    And the remedy for the effectuation of the
right and the redress of the wrong is applied upon considera-
tions which take no account of whether the corporation whose
earnings have thus been wrongfully diverted from the payment
of its employes is a railroad company or a manufacturing com-
pany or a mining company.   The diversion of the fund being
shown and the equity being thus made to appear, the redress
is accorded, the equity is declared and effectuated, by courts of
chancery, upon the broad and beneficent maxim of equity juris-
prudence, which imposes or authorizes the court to impose, upon
every suitor asking equitable relief, the duty and burden of
doing equity; and we have not heard or seen it suggested that
this principle is applicable more to one suitor than another or
more to a public than a private corporation.   The necessity for
the application of this equitable doctrine for giving preference
to claims of employes for wages is doubtless more frequent in
railroad cases, but that does not argue that the facts which

authorize it cannot as well exist in other cases." "We have undertaken to state this doctrine as it has been declared in other jurisdictions, and there applied to railroad property, and to give our reason, on general principles, for the conclusion we have reached—that that limitation of the doctrine is unsound, and that, of consequence, in our opinion, the equity is as salutary and its effectuation is as practicable and necessary against the bondholders of a private as against those of a public corporation. The argument against this wide application of the doctrine which is based upon the supposed fact that such application has not heretofore been made is the same argument which stood in the way of the conclusion in *Fosdick* v. *Schall,* and was in that case entirely demolished in respect of railroad corporations and their property—the same argument, indeed, that has had to be met and overthrown in every new application of every new equitable principle, and which, had it been allowed to obtain and control, would have left England and this country without the splendid system of equity jurisprudence which now embellishes the jurisprudence of both countries. It may be, as suggested, that courts have been very stupid or very much at fault in not making an earlier application of these principles to cases like the present one; but, if so, it is the same stupidity which delayed the declaration of the doctrine of *Fosdick* v. *Schall,* that in the early ages failed to recognize the equity jurisprudence at all, and which, upon the eventual establishment of the court of chancery, stood in the way of the immediate development and application of all the principles of equity into a perfect system of equity jurisprudence, which has not even yet been attained. The broader application of the doctrine which we are attempting to justify, on what we regard as very plain and simple and elementary principles of equity, will not lead to, involve, or admit of any of the dire consequences which are suggested, as will be clearly seen upon reference to the limitations which those principles themselves involve, and which we have endeavored to state with care and precision. It will

not take the place of mechanic's lien laws and the like nor obviate the necessity or policy of such enactments.    It will not in any sense encroach upon vested or contractual securities or right.    The principles upon which it rests, in the application of it which we are proposing, in and of themselves, mark a distinct line between the particular corporation cases to which it applies and the ordinary cases of mortgages on property, whether of individuals or corporations, to secure the payment of debts; and under it there is not the slightest danger of the secured creditor, in any case, losing anything which he is entitled to, on recognized principles of equity and good conscience." All which seems to us eminently true.    We prefer, however, resting the jurisdiction on the second ground stated by McClellan, C. J.

*Affirmed.*