# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-01485-SCT

*LEND LEASE ASSET MANAGEMENT, L.P.,*
*AUTHORIZED SERVICER FOR LASALLE BANK*
*NATIONAL ASSOCIATION, AS TRUSTEE FOR*
*CHASE COMMERCIAL MORTGAGE, AND THE*
*RECEIVER, MARILYN GOOLSBY*

*v.*

*COBRA SECURITY, INC., AND WAYNE MILLS*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/11/2004 |
| TRIAL JUDGE: | HON. EDWIN H. ROBERTS, JR. |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | JOHN H. FREELAND |
| | MICHAEL REED MARTZ |
| ATTORNEYS FOR APPELLEES: | RALPH STEWART GUERNSEY |
| | DAVID G. HILL |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 10/13/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE COBB, P.J., CARLSON AND DICKINSON, JJ.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1. In this case, the primary issue presented is the validity of a judgment entered by a chancellor against a receiver who refused to pay from receivership funds certain unsecured debt which antedated the receivership.

## BACKGROUND FACTS AND PROCEEDINGS

¶2.     Aegis Oxford, owner of property known as The Oxford Mall, decided to call it quits. Unable to pay its outstanding $6.5 million debt which was secured by virtually all of its property including rents and accounts receivable, Aegis tendered a deed in lieu of foreclosure to Lend Lease Asset Management, LP, described by the parties as the "authorized servicer for LaSalle Bank National Association, a national banking association, as trustee for the registered holders of Chase Commercial Securities Corporation."[1]   After refusing to accept the deed in lieu of foreclosure, Lend Lease petitioned the Chancery Court of Lafayette County on April 14, 2003, for the appointment of a receiver "for Aegis Oxford, L.L.C."  Aegis filed a Consent to Appointment of Receiver for "the Oxford Mall" and, on April 15, 2003, the Chancery Court of Lafayette County entered an order which included the following provision: "This Court should appoint a receiver for the Oxford Mall[2] in order to maintain the property mall (sic) and to avoid potential waste."   The chancellor then appointed the previous Mall manager, Marilyn Goolsby, as receiver.

¶3.     During the course of the receivership, Goolsby collected the rents from Mall tenants and paid certain debts.  On advice of counsel, however, she refused to pay amounts due to Cobra Security, Inc. for services rendered prior to the establishment of the receivership.

¶4.     On May 28, 2003, a notice of foreclosure of the Mall property was published, setting the sale date as June 19, 2003.  The day before the foreclosure was to take place, one of Aegis'

---

[1]As far as we can tell from the record submitted to this Court, Chase Commercial Securities Corporation was the prime creditor of Aegis Oxford, L.L.C.

[2]Although the chancellor's order does not specify, we assume the court intended to appoint a receiver for Aegis Oxford L.L.C., as requested in the petition.

unsecured creditors Cobra Security, Inc.,[3] filed a lawsuit against numerous parties including Aegis and the Receiver. The complaint alleged that the Receiver had not paid $10,208.70 due to Cobra, and that the failure to pay violated the mandate of the chancery court's April 15, 2003, order to "[c]ollect and compromise all demands" and "incur . . . the obligations ordinarily incurred by owners of similar businesses." Furthermore, predicting difficulty collecting the bill in the event of foreclosure, Cobra persuaded the chancellor to enter an ex parte order attaching the Oxford Mall. Cobra also filed a lis pendens notice of the litigation. According to Lend Lease, the attachment and lis pendens effectively stopped the foreclosure.

¶5. Thereafter, upon the parties' agreement, the chancellor set aside the attachment and lis pendens and, on September 18, 2003, the Mall property was foreclosed. The foreclosure sale resulted in a $2,649,704.49 deficiency which was further secured by a perfected security interest in substantially all of the assets of the Mall, including rents and accounts receivable due from tenants.

¶6. On October 17, 2003, the Receiver responded to Cobra's complaint with an answer and a counterclaim. The answer asserted that Chase's secured deficiency of more than $2.7 million rendered Cobra's claims moot, and the counterclaim asserted that Cobra should respond in damages for wrongfully obtaining an ex parte attachment which effectively prevented the foreclosure and damaged a potential tenant contract.

¶7. On January 30, 2004, the Receiver amended its previously filed motion for summary judgment to assert that, since the receivership did not even have sufficient funds to satisfy the

---

[3]Actually, both Cobra and its president, Wayne Mills, were named as plaintiffs. We are given no information or analysis whatsoever to assist us in understanding why Mills was an appropriate plaintiff.

secured creditors, the claims of unsecured creditors such as Cobra were moot. The motion also asserted that Cobra had been paid all amounts due for services rendered subsequent to the establishment of the receivership, and that collections suits against the Receiver to collect pre-receivership debt were inappropriate.

¶8. On August 25, 2003, the matter proceeded to trial. Following Cobra's case-in-chief, Aegis confessed judgment in the amount of $20,076.63. The chancellor deferred his ruling as to all other defendants.

¶9. On June 14, 2004, the chancellor issued a Judgment and Order of the Court, stating that the issues before the court were:

> the validity of the debt allegedly owed to Cobra Security by The Receiver and/or Aegis, . . . if Lend Lease [was] entitled to damages based on Miss. Code Ann. § 11-13-35, . . . [and] the actions of Marilyn Goolsby, Receiver, from the time of her appointment on April 15, 2003, to the posting of the bond on July 16, 2003, to determine if the receivership was valid and whether Goolsby was actually acting in the capacity of a receiver . . . [and] the validity of the Receiver's actions in paying certain vendors/creditors and not others.

¶10. The chancellor held that Cobra had a valid judgment against the Receiver as well as Aegis in the amount of $20,076.63. The chancellor further held that since Cobra was a judgment creditor, it had a higher priority than other creditors to a Toyota Tacoma Truck. Therefore Cobra's proposed execution on the vehicle was allowed, and its value would reduce the $20,076.63 judgment.

¶11. The chancellor further held that Lend Lease was not due damages because the statute under which they were claimed was inapplicable and because the parties waived any claim for damages by entering into the Agreed Order which set aside the attachment and allowed the foreclosure. The chancellor held that both the receivership and foreclosure sale were valid,

4

but that Chase's $2,649,704.49 deficiency resulting from the foreclosure was unsecured debt with no priority over any other debt. The basis for this ruling was that "[n]o claim or pleadings have been filed by the mortgage company to assert their right to such a judgment or priority."

¶12. Within the judgment, the chancellor stated that the priority of claims among the creditors would be :

> 1. CAM,[4] real estate tax, insurance, promotion, trash and water CAM (Including judgments recovered in this opinion),
>
> 2. Administration expenses for the operation of the receivership including attorney's fees and compensation for the Receiver,
>
> 3. Judgment holders,
>
> 4. Unsecured debt.

The chancellor further held that "[a]ll other claims by any party not specifically mentioned are hereby denied." The chancellor subsequently entered the judgment against both Aegis and the Receiver.

¶13. Although a notice of appeal was filed by both the Receiver and Chase, only the Receiver submitted a brief, presented oral argument, and pursued the appeal.

## ANALYSIS

¶14. In her appeal, the Receiver raises two issues. The first issue is whether the chancellor erred in granting a judgment to Cobra while the second issue is whether Cobra should be held liable for obtaining an ex parte order attaching the Mall and stopping the foreclosure. Our standard of review for both issues is the same. The chancellor's findings of fact are conclusive

---

[4]The acronym "CAM" is found in the Mall lease contracts. It stands for "common area maintenance." A portion of the payments made each month by tenants of the Mall was for Common Area Maintenance.

unless we find he abused his discretion, *Miller v. Pannell*, 815 So. 2d 1117, 1119 (Miss. 2002), and his conclusions of law are reviewed de novo. *Saliba v. Saliba*, 753 So. 2d 1095, 1098 (Miss. 2000).

*The wrongful attachment claim*

¶15.    We begin by addressing the Receiver's second issue which we find is moot. Any damage accruing from the attachment of the Mall and delay of the foreclosure accrue to the benefit of Aegis's secured creditor, Chase. We fail to see any harm visited upon the Receiver as a result of the delay in foreclosure. Thus, we shall not address the issue further.

*The damage claim against the Receiver*

¶16.    As to the first issue, the Receiver makes three arguments asserting that the chancellor ignored the law and the security agreements to give Cobra a judgment in this case. To support her position, the Receiver provides three arguments:  (i) Cobra had no security interest in the rent proceeds[5] from the Mall and whatever claim it may have had against Aegis was extinguished by the foreclosure; (ii)   the chancellor erred in finding that the Receiver failed to act in good faith; and (iii) the chancellor erred in ordering her to pay contract damages and attorney's fees to Cobra, based on Cobra's contract with Aegis Oxford.

¶17.    However, we find the true question to be whether Cobra had any legal claim against the Receiver, justifying a recovery of damages. Because we find no such legal claim existed, we need address no other issues raised.

---

[5]It appears from the record that Cobra made no effort to execute on anything other than the rent proceeds, in which Chase had a security interest, or the Tacoma Truck, in which no one had a security interest. Cobra did not attempt to execute on anything else, e.g. equipment, machinery, fixtures, furniture, or the like.

¶18.   The Receiver argues that Cobra had no right to any pre-receivership income of Aegis Oxford because the same fell under the perfected security interest of Chase, who had both a deed of trust covering the property and a perfected security interest covering all other property of Aegis Oxford.  We find the issue to be different.  The question is not whether Cobra had a claim against the rents, rather the question is whether Cobra may recover from the Receiver for refusing to pay Cobra's pre-receivership invoices.

¶19.   In establishing the receivership, the chancellor charged the Receiver with certain obligations and powers.  The obligations were simply "to maintain the property mall (sic) and to avoid potential waste."  In order to fulfill these obligations, the chancellor granted to the Receiver the following powers:

   (1)   Take charge and keep possession of all real and personal property pledged as collateral for the Loan;

   (2)   Take charge and keep possession of all bank accounts currently held in the name of the Borrower or the Mall;

   (3)   Receive all rents;

   (4)   Collect and compromise all demands;

   (5)   Make transfers;

   (6)   Apply the earnings of the Property held in the Receivership to the payment of the following claims in the order listed:

      (a)   Court costs of suit;

      (b)   Wages of employees due by the Receiver;

      (c)   Debts owed for materials and supplies purchased by the Receiver for the maintenance and improvement of the Property held by Receiver;

7

> > (d) Debts due for improvements made during the Receivership to the Property held by Receiver;
>
> > (e) Claims and accounts against the Receiver on contracts made by the Receiver with respect to the collateral.
>
> (7) The Receiver be empowered to do all things ordinarily done by, and to incur the risk and obligations ordinarily incurred by owners, managers and operators of similar businesses and enterprises[.]

¶20. We find nothing in the Receiver's obligations which arguably required her to pay debts incurred by Aegis prior to the establishment of the Receivership. The record is void of any evidence which arguably established that failure to pay Cobra's past-due bill would result in lack of maintenance or waste of the mall property.

¶21. With respect to Chase's position as a secured creditor, we find the record conclusively, and without contradiction, establishes that the $2.7 million deficiency from the foreclosure was debt secured by virtually all assets of Aegis's Mall property, including rents and accounts receivable. However, neither Chase nor the question of whether the chancellor enjoyed power sufficient to allow him to reclassify this debt as unsecured is before us.

*Pre-receivership debt*

¶22. Cobra claims it was a priority creditor because its security services were necessary to the Mall's continued operation. Thus, says Cobra, the Receiver had a duty to pay its pre-receivership invoices, and the Receiver's breach of that duty supported the Chancellor's judgement. Cobra misunderstands the purpose of the receivership and duties of a Receiver. The sole scenario where this Court has given an unsecured creditor in Cobra's position favorable consideration involved claims of employees who performed labor just prior to the establishment of a receivership. *See Travelers Indem. Co. v. Clark,* 254 So.2d 741 (Miss.

8

1971); ***Loggans v. Love,*** 183 Miss. 97, 183 So. 389 (1938); ***A.H. George Co. v. Pigford***, 97 Miss. 332, 52 So. 796 (1910); ***L'Hote v. Boyet***, 85 Miss. 636, 38 So. 1 (1905).  The rationale behind this doctrine was first summarized in ***A.H. George v. Pigford*** as:

> We decline to extend the doctrine beyond the claims of laborers, the wage class, who are favored by law .... There is no difficulty in applying the doctrine in question to the claims of laborers; while, on the other hand, great injustice and inequality would result in its application to any other class of claims. To illustrate: In the instant case, the appellants are merchants seeking a preference for feed stuff furnished this sawmill corporation with which to feed its oxen, to enable them to haul logs to the mill to be sawed into lumber, which lumber was on hand at the time of the appointment of the receiver. Why should such a claim be preferred over that of any other unsecured creditor? Why over the claim of another merchant, who furnished the company clothing and food for the laborers in its employ, who cut the trees and drove the oxen back and forth in hauling logs to the mill? Why over the claim of a bank which loaned the concern money with which to buy materials to go into the betterment of the plant, or with which to buy timber to be sawed into lumber? Or any other indebtedness incurred, which directly or indirectly contributed to keeping the plant a going concern, and to continue or increase the income therefrom? We can conceive of no indebtedness necessarily incurred about the business which would not contribute to that end.

52 So. at 797.

¶23.    The duties of the Receiver in this case were to preserve and protect the property, including rents collected; to make such payments as were authorized by the chancellor  and as were necessary to protect the property from waste; and to make payments for services contracted for by the Receiver.  The record in this case is void of any evidence that these duties were breached.  Cobra's claim for pre-receivership services must be pursued against Aegis, the entity contracting therefor; while the responsibility for payment for Cobra's post-receivership services was upon the Receiver. It is uncontradicted that Cobra was compensated for all such post-receivership services.

*The 2003 Toyota Tacoma Truck*

¶24.    After the chancellor entered the March 31, 2004, judgment in favor of Cobra, and against Aegis, Cobra executed on a 2003 Toyota Tacoma truck owned by Aegis. We find the chancellor's order and the execution on the truck in partial satisfaction of the judgment to be proper. Miss. Code Ann. § 63-21-15 (Rev. 2004) provides that a security interest in a titled vehicle in Mississippi may be perfected only by including on the certificate of title the name of the lienholder. The title to the Tacoma truck reflected no lienholder. Thus, when Cobra obtained its judgment against Aegis, it became a judgment creditor with a priority claim over other creditors to the truck.

*Attorney's fees*

¶25.    The Receiver further argues that attorney's fees may not be awarded in the absence of a contract provision or statute, citing **Miss. Power Co. v. Hanson**, 905 So. 2d 547, 552 (Miss. 2005). Therefore, the Receiver argues the chancellor erred in awarding $12,652.22 in attorney's fees that Cobra claimed to have incurred in collecting $2,865 for services prior to the receivership. The Receiver asserts that the chancellor does not explain how this figure was calculated or why Cobra is entitled to these fees. The Receiver also argues that Cobra failed to present an evidentiary basis for the amount it demanded, and did not establish the reasonableness and necessity of the fees as required under Mississippi law.

¶26.    In response, Cobra argues that the Receiver ratified Aegis Oxford's contract with Cobra and was therefore bound by its terms. Thus, Cobra submits the chancellor was correct in awarding contract damages and attorney's fees to Cobra.

10

¶27. Cobra submits that after the Receiver was appointed, she told a representative of Cobra that Cobra was bound by the thirty-day notice provision in the contract with Aegis. Cobra's representative testified: "I asked Mrs. Goolsby what day would she like for our last day to be. And she said, may I remind you, you're under 30 days contract." Additionally, Cobra submits that the Receiver told Cobra's representative that Cobra would be paid for future and past work, and that after she assumed the role of receiver, the Receiver met with Cobra and requested that it continue providing security services to the Mall. Cobra asserts that this conduct shows acceptance of the contract. Cobra submits that this Court has held that actions may show acceptance of a contract. Cobra further claims that the Receiver's statement to Cobra that it was still bound by its contract to provide thirty days notice before terminating its services amounts to a ratification of the contract. Thus, Cobra claims the Receiver was bound by the contract and the chancellor properly granted contract damages and attorney's fees.

¶28. We find that, even if the Receiver did agree to continue under the same contractual relationship Cobra had with Aegis, the effect of the agreement would be prospective only, that is, the Receiver could be held responsible only for failure to pay amounts coming due after ratification. Thus, the chancellor erred in awarding attorney's fees and expenses to Cobra for its efforts in collecting debt incurred prior to the establishment of the Receivership.

**CONCLUSION**

¶29. We affirm the chancellor's dismissal of claims against Cobra for wrongful attachment of the Mall. We affirm the chancellor's order allowing Cobra to execute on the Tacoma truck in partial satisfaction of the judgment against Aegis. We reverse the chancellor's judgment

11

against the Receiver, and we render judgment for the Receiver on Cobra's claim for contract damages and attorney's fees.

¶30.    **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON AND RANDOLPH, JJ., CONCUR.  EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**